UNITED STATES of America, Appellee,

v.

Solomon SCHWARTZ, Leon Lisbona, H. Leonard Berg and Grimm DePanicis, Defendants,

Appeal of Solomon SCHWARTZ, H. Leonard Berg, Leon Lisbona and Grimm B. DePanicis, Defendants–Appellants.

Nos. 835, 836, 758 and 759, Dockets 89–1363, 89–1364, 89–1365 and 89–1474.

United States Court of Appeals, Second Circuit.

Argued March 12, 1990.

Decided Jan. 15, 1991.

Steven Alan Reiss, New York City, for appellant H. Leonard Berg.

Adina Schwartz (The Legal Aid Society, Federal Defender Services Appeals Unit, New York City, of counsel), for appellant Grimm B. DePanicis.

Irving Anolik, New York City, for appellant Solomon Schwartz.

Nathan Z. Dershowitz, New York City, (Victoria B. Eiger, Daniel R. Williams, Dershowitz & Eiger, New York, New York; Alan M. Dershowitz, Cambridge, Mass., of counsel), for appellant Leon Lisbona.

Ira Belkin, Asst. U.S. Atty., E.D.N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., David C. James, Emily Berger, Asst. U.S. Attys., Larry H. Krantz, Special Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Before KEARSE, CARDAMONE and MAHONEY, Circuit Judges.

CARDAMONE, Circuit Judge:

Appellants are four individuals engaged in the business of exporting American-built arms to foreign purchasers. They planned during 1982–84 to ship ammunition, night vision goggles, automatic rifles and other military equipment to prohibited destinations in four separate deals: the first to export night vision devices to Argentina during the 1982 Falkland Island War between that country and Great Britain (Argentina Deal); the second to export firearms and ammunition to Iraq via the Netherlands and Belgium (Iraq Deal); the third involved a government sting operation in which appellants made plans to ship night vision devices to the Soviet Union, and actually shipped one as a sample to an undercover federal agent in West Germany (Soviet Deal); the fourth to ship a planeload of arms and ammunition to Poland (Poland Deal).

The four schemes were to be carried out in large part by HLB Security Electronics, Ltd. (HLB)—a company in the business of selling arms aborad—and the four appellants, Solomon Schwartz, H. Leonard Berg, Leon Lisbona, and Grimm DePanicis. Berg owns HLB, and Lisbona was alleged to be his silent partner. DePanicis is an HLB salesman, and Schwartz ran his own arms business, but acted as a partner with Berg and Lisbona for the four deals. Fortunately, only the Argentine arrangement came to fruition; appellants were caught, tried and convicted in the United States District Court for the Eastern District of New York (Platt, C.J.). From the facts in this extensive record developed during defendants' four-month jury trial, one may gather that arms merchants inhabit a shadowy world of intrigue and deceit, untrammeled by truth.

Defendants Schwartz, Berg, and Lisbona were convicted for (1) conducting a racketeering enterprise through a pattern of such activity in violation of 18 U.S.C. § 1962 (RICO count); (2) three counts of wire fraud in violation of 18 U.S.C. § 1343; (3) three counts of conspiracy to violate the Arms Export Control Act in violation of 18 U.S.C. § 371; (4) two counts of making false statements to the U.S. State Department Office of Munitions Control in violation of 18 U.S.C. § 1001; and (5) four counts of exporting arms in violation of the Arms Export Control Act. 22 U.S.C. § 2778(b)(2) and (c). Schwartz and Berg were also convicted on one count of obstructing an agency proceeding in violation of 18 U.S.C. § 1505. Defendant DePanicis was convicted of conspiring to violate the

Arms Export Control Act, in violation of 18 U.S.C. § 371, and exporting arms in violation of 22 U.S.C. § 2778(b)(2) and (c). All appeal their June 23, 1989 judgments of conviction.[1]

## FACTS

### 1. *The Argentina Deal*

It is helpful in understanding the issues raised to recite briefly the activities involved in each of the four plans. Counts 2 and 3 of the indictment involved the sale of $7 million worth of night vision devices to an Argentine businessman, Mauricio Waicman, who purchased these devices for the Argentine military. Waicman informed appellants he was interested in purchasing large quantities of night vision equipment, as well as other military articles, for Argentine military forces to use against the British in the then ongoing Falkland Islands War. Appellants contacted Litton Industries (Litton), the primary producer of night vision devices, and attempted to place Waicman's order. Litton took steps to insure the equipment would not be illegally exported from the United States. In the first contract Litton made HLB agree to be "fully responsible for compliance with all laws and regulations pertaining to the export of night vision goggles." As HLB began placing larger orders for the goggles, Litton further required HLB to disclose the identity of its customer, provide information showing that appropriate documentation had been obtained by its customer, and have its customer state that the equipment would remain in the United States until the U.S. State Department's Office of Munitions Control (Munitions Control Office) issued the proper export licenses. A Litton executive testified at trial that until HLB met these conditions, Litton refused to sell it any equipment.

In responding to Litton's requirements, appellants did not disclose that the equipment was destined for Argentina, and that their customer was Waicman, the Argentine businessman. Rather, they told Litton that their customer was Texas Armaments

Advisors—an inactive corporate shell controlled by Schwartz and a partner—and to convince Litton that the equipment was in fact going to Texas Armaments, appellants produced an HLB financial statement showing a $1 million account receivable balance owing from Texas Armaments that referred to the ordered equipment.

Testimony at trial established that the night vision goggles were smuggled into Argentina by couriers traveling on commercial airliners. A representative of the British Ministry of Defense testified that British forces recovered several of them from the Argentine military, and the serial numbers on seven of them matched the serial numbers on HLB and Litton business records, confirming that these were the same devices sold to HLB.

### 2. *The Iraq Deal*

Counts 4 through 7 of the indictment charged defendants with an attempt to send 110 boxes of firearms and ammunition to Iraq through the use of export licenses falsely stating the Netherlands as the ultimate destination. In the summer of 1982, appellants were approached by an Iraqi named Abu Marwan who sought guns and ammunition for delivery in Iraq, allegedly for the Iraqi National Police.

Appellants obtained an export license upon an application that falsely stated that the end destination was the Netherlands. Upon presenting the license to Customs officials, defendants were able to ship the guns and ammunition to a Netherlands-based company, Holland Arms. Defendants planned to "transship" the guns to Iraq after their arrival in the Netherlands, but the government refused to issue an export license. As a result, the guns and ammunition were detained in that country for many months. Eventually appellants succeeded in having the arms moved to Belgium while they attempted to devise alternate methods to get this military material to Iraq. Ultimately the arms were seized by the Belgian government and sent back to the United States.

---

**1.** This opinion has been circulated to all the active judges of this Court prior to its filing.

### 3. *The Soviet Deal*

Counts 8 and 9 arose out of the government "sting operation." In the summer of 1983 appellants were approached by an undercover government informant—an arms dealer named Ben Jamil—whose cooperation resulted from a plea agreement relating to other illegal arms exports that he had been engaged in. Jamil wanted 400 Litton night vision goggles and told appellants the goggles would be sent either to the Soviet Union or East Germany. On instructions from the Customs agent supervising the investigation, Jamil asked that one set of goggles be sent to an address in West Germany, purportedly to allow the Soviet or East German purchasers to examine it as a sample. Appellants sent a pair of goggles to the West German address, where it was received by another Customs agent.

Surveillance tapes were made of the numerous conversations between Jamil and appellant Lisbona. On some of the later tapes, Lisbona told Jamil that he would not do anything "illegal" and that there was "a way to do it legally" with "proper" End User Certificates—documents submitted to the Munitions Control Office by an exporter stating the ultimate user of the arms shipped—indicating West Germany as the end user. On one recording, Jamil said, "but you know where they're going," to which Lisbona replied, "No, I don't want to know where."

Despite the fact that appellants made plans to proceed with the sale, the 400 night vision goggles were never actually shipped either to Jamil or the undercover agents.

### 4. *The Poland Deal*

Counts 10 through 14 cover an attempt to ship 500 automatic rifles and 100,000 rounds of ammunition from the United States to Poland using an export license falsely designating Mexico as the shipment's destination. Again, the government used a confidential informant, the pilot who was to fly the arms to Poland, to build its case.

The pilot, Joseph Haas, was approached by an acquaintance in December 1983 about flying a planeload of arms to Poland. Haas, who had previously worked as an informant for the Customs Service, contacted the Service and agreed to assist in the investigation. Thereafter, he engaged defendants in several conversations that were tape-recorded. During one recorded meeting, Schwartz gave Haas the details of the planned flight to Poland, explaining that the pilot would pick up the rifles and ammunition at Kennedy Airport in New York, fly to London where he would pick up another load of rifles, and then fly to Belgium where he would pick up a third load of arms, presumably the shipment languishing there from the Iraq Deal. The entire planeload, Schwartz told Haas, would then be flown to Poland, its final destination.

Haas also dealt with appellant Berg in making arrangements for the Poland Deal. Berg obtained phony Mexican purchase orders to be used to obtain a license authorizing the export of arms to Mexico. When Haas flew his plane to Kennedy Airport to pick up the first load of arms, Customs officials decided to detain the shipment and instructed Haas to communicate with Berg and Schwartz. Haas called Berg and told him that the Customs Service had detained the shipment and was opening the boxes. Berg instructed Haas to tell the officials that the arms were destined for Mexico as indicated on the export license.

Customs then interviewed Schwartz and Berg and asked about the rather unusual flight plan, that is, a shipment intended for Mexico that had stopovers in London, Belgium and Poland. Schwartz and Berg denied that the plane was to be flown to Belgium or Poland, contending that it was supposed to fly from New York to London, and from there directly to Mexico City. In the course of the interview they made numerous other misrepresentations regarding the aborted flight and the purported order from Mexico. Finally, when one of the Customs agents suggested that they bring in a Mexican General to question him about the alleged order, Schwartz told the agents that he was working with the Defense Intelligence Agency on a different project,

and that he believed Haas may have confused the arms shipment to Mexico with the Intelligence Agency project that Schwartz had mentioned to him.

This shipment of rifles and ammunition never got off the ground. Customs agents detained it at Kennedy while looking further into the surrounding circumstances, and while the Service pondered whether formally to seize the entire shipment.

## DISCUSSION

Before proceeding to an analysis of the ten contentions appellants raise on appeal, we set forth a brief summary of the Arms Export Control Act, 22 U.S.C. § 2751 *et seq.* (1988) (Act), the violation of which underlies this prosecution. The Act establishes the basic requirements for the sale and export of American-made military equipment and ammunition to foreign purchasers. Before a private exporter may sell any article contained on the Munitions Control List he must apply for an export license from the U.S. State Department's Office of Munitions Control. The exporter must include in the application a description of the arms, their ultimate destination, and their intended use. 22 C.F.R. §§ 123.1, 123.9 (1990). The Munitions Control Office then decides whether to grant the license based upon the information contained in the application. If an export license is granted, the exporter must present it to the Customs Service at the time of export.

It is undisputed that for the period of time during which the deals in question were undertaken, all of the military equipment the defendants intended to export was listed on the Munitions Control List. Also, during the relevant time, testimony at trial established that the Munitions Control Office was prohibited by law from issuing licenses for the export of arms to Argentina, and that it was the office's policy to deny all applications for shipments to the Soviet Union, Poland, East Germany and Iraq.

I The Fraud and RICO Convictions

With that background in mind, we turn first to appellants' claims that their convictions under the wire fraud statute and under RICO must be overturned because the government failed to establish the elements of wire fraud.

### A. Fraud Against the Office of Munitions Control

The district court held alternatively that appellants' convictions under counts 5 and 11 may be upheld either as violations of the wire fraud statute, 18 U.S.C. § 1343 (1988) —because the government licenses appellants fraudulently obtained constituted property in the hands of the government, as the term "property" was construed in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987)—or as violations of 18 U.S.C. § 1346 (1988).

### 1. Convictions Under 18 U.S.C. § 1343

■ Because the mail fraud and the wire fraud statutes use the same relevant language, we analyze them the same way. *See United States v. Covino*, 837 F.2d 65, 71 (2d Cir.1988). The federal fraud statutes prohibit the use of the mails or wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343 (1988). Appellants assert that an unissued license in the hands of the government is not property, but instead is an instrument of regulation and therefore unprotected by the fraud statutes.

In *McNally*, the Supreme Court held that in spite of the disjunctive language brought about by the word "or," the mail fraud statute only punished those who had fraudulently deprived others of their property; the deprivation of intangible rights to honest services did not in itself violate the statute. 483 U.S. at 358–61, 107 S.Ct. at 2880–82.[2] *McNally* was clarified in *Carpenter v. United States*, 484 U.S. 19, 108

---

**2.** In 1988, Congress reacted to *McNally* by amending the fraud statutes so that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346 (1988).

S.Ct. 316, 98 L.Ed.2d 275 (1987), where the Court held that *"McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." *Id.* at 25, 108 S.Ct. at 320. Thus, to sustain appellants' convictions under the wire fraud statutes, the government must have been deprived by appellants' fraud of some property, whether styled as tangible or intangible. In denying appellants' motion for judgment of acquittal, the district court held that the export licenses issued to appellants were government property. We think this ruling is mistaken for several reasons.

To begin with, most of our sister circuits addressing this issue have concluded that an unissued license does not constitute property in the hands of the government for federal fraud statute purposes. *See United States v. Kato*, 878 F.2d 267, 268– 69 (9th Cir.1989); *Toulabi v. United States*, 875 F.2d 122, 125 (7th Cir.1989); *United States v. Murphy*, 836 F.2d 248, 254 (6th Cir.), *cert. denied*, 488 U.S.. 924, 109 S.Ct. 307, 102 L.Ed.2d 325 (1988); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir.1990). Only the Third Circuit, in *United States v. Martinez*, 905 F.2d 709, 713–15 (3d Cir.1990), has held to the contrary.

Moreover, with respect to the district court's holding that the government had an intangible property interest in the export licenses it issued, our prior decision in *United States v. Evans*, 844 F.2d 36 (2d Cir.1988), controls. In that case the defendants were charged with conspiring to provide false end user certificates and other documents to the United States in order to obtain the necessary government approval for the contemplated transaction, there the sale of arms manufactured in or by license from the United States, but now owned by foreign countries, to Iran. *Id.* at 37. Although the indictment charging mail and wire fraud alleged only that the government was deprived of its property interest in the arms themselves and the commissions from the sale of those arms, the district court asked the parties to address the question of whether the government's right to control future alienation of arms may be classified as a property right for

federal fraud purposes. *Id.* at 38. When the district court ruled that the government's right to control alienation of the arms was not a property right, we affirmed, holding that the government's interest was "ancillary to a regulation, not to property." *Id.* at 42.

■ *Evans* cannot be distinguished on the basis that the fraudulently obtained government approval in this case was embodied in a license. What was fraudulently obtained in both cases was the government's agreement to allow the proposed transactions to take place. Implicit in *Evans* is the notion that the government's power to regulate does not *a fortiori* endow it with a property interest in the license; that is, the mere issuance of a document designed to formalize the government's regulation does not thereby create a property interest for the government.

The government's interest in issuing its licenses ancillary to its regulatory program is no different than its interest in propounding and enforcing its other regulations with broad based applications that do not include the issuance of licenses. Whether it chooses to use licenses or blanket rules, the government's purpose is to control the private use of private property. Thus, a regulatory license is nothing more than a formal embodiment of "the necessary government approval." 844 F.2d at 37. This is particularly pertinent since government approval of almost any significant transaction will take a written form, so that incongruous results would ensue from a distinction based upon the character of a writing, depending on whether the writing that grants approval is a license instead of a less formal document or merely oral or implied approval.

Seeking to uphold the district court's ruling, the government proffers two alternative theories under which it asserts that a property right in the licenses may be found. It argues initially that the export licenses fraudulently obtained by appellants constitute tangible property because they have a physical existence, *i.e.*, the slip of paper, the ink, the seal of the Depart-

ment of State, and the signature of the licensing officer. This proposition is patently absurd. In the present instance, the Munitions Control Office was not in the paper and ink business, *see Jolly v. United States*, 170 U.S. 402, 405–06, 18 S.Ct. 624, 625–26, 42 L.Ed. 1085 (1898) (U.S. Postal Service is in the business of producing postage stamps, and stamps, consisting of paper and ink are property whether in the hands of the government or in the hands of an individual), it is a regulatory agency with the power to grant or withhold a license. The paper licenses given appellants were merely the expression of its regulatory imprimatur, and they had no other effect as "property" beyond their role as representatives of this regulatory grant. *See* Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 Yale L.J. 16, 21 (1913) ("Sometimes [the word 'property'] is employed to indicate the physical object to which various legal rights, privileges, etc., relate; then again—with far greater discrimination and accuracy—the word is used to denote the legal interest (or aggregate of legal relations) appertaining to such physical object."). To argue—as the government does—that the actual pieces of paper were property begs this larger question that was discussed earlier.

Further, the value of the paper, ink and seal at issue is plainly inconsequential and—as *McNally* held that "to defraud" meant depriving individuals or the government of something of value, 483 U.S. at 358, 107 S.Ct. at 2880–81—must be deemed *de minimis* as a matter of law. *See Granberry*, 908 F.2d at 280.

■ The government asserts secondly that its right to subject the arms intended for illegal shipment to seizure and forfeiture, 22 U.S.C. § 401(a) (1988); 22 C.F.R. § 127.5(a) (1990), constitutes an intangible property right of which it was deprived by appellants' fraudulent acquisition of the export licenses. The government insists that this right exists separate and apart from its right in the licenses. We refuse to consider this argument because the district court did not instruct the jury on this theo-

ry. The jury therefore could not have based its verdict on the alternative intangible property theory about which it received no instructions from the trial court.

The government urges that we address this point because, it says, the jury, in finding that appellants obtained the export licenses by fraud, would *of necessity* have found that the government was deprived of its right to seize the arms. We need not decide whether this is actually the case because the government fully availed itself of that right by ultimately seizing both shipments for which false licenses had been obtained.

Consequently, we hold that the government's interest in the unissued export licenses is ancillary to its power to regulate, and is not a property interest within the meaning of the wire fraud statute.

### 2. *Retroactive Application of 18 U.S.C. § 1346*

■ Appellants next challenge their convictions for violating the wire fraud statute by defrauding the Munitions Control Office of arms export licenses under counts 5 and 11 by attacking the district court's retroactive application of 18 U.S.C. § 1346 to those counts. Appellants contend that such an application violates the Constitution's prohibition against *ex post facto* laws because the acts for which they were charged were committed prior to the 1988 enactment of § 1346. Assuming, without deciding, that the definition in that section covers the acts with which appellants were charged, we agree with appellants' *ex post facto* contention.

Article I, section 9 of the Constitution prohibits Congress from enacting any *ex post facto* law. This constitutional safeguard protects persons from being subject to prosecution and punishment for conduct that was not criminal at the time it was committed. In applying § 1346 retroactively, the district court acknowledged the *ex post facto* prohibition, but decided that § 1346 applied to acts committed prior to the Supreme Court's decision in *McNally* because, it reasoned, those acts were punishable when committed under the fraud

statutes pre-*McNally*, so the defendants were already on notice. *See, e.g., United States v. Margiotta*, 688 F.2d 108, 121 (2d Cir.1982) (fraud statutes do not require a deprivation of property), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). We are unable to agree with this reasoning.

The fact that the circuit courts had uniformly held prior to *McNally* that the fraud statutes applied to the deprivation of intangible non-property rights—thereby giving defendants notice that at the time they engaged in these illegal arms schemes the lower federal courts considered such conduct punishable by the fraud statutes—does not provide an exception to the *ex post facto* prohibition. Although the critical concept contained in the *ex post facto* clause is the need to give notice of what constitutes activity punishable under the law, the district court cited no authority—and we are not aware of any—for the proposition that a defendant's subjective belief that his actions might violate then existing law, though in fact they did not, allows application of an *ex post facto* law to his case.

Further, as the district court noted, we had yet to decide whether fraudulent procurement of a government issued license was punishable under the fraud statutes, and it cannot be assumed that we would have followed the reasoning of other circuits to hold that it was. Thus, the question was an open one, a fact that further contravenes the district court's belief that the defendants were on notice that their activities were subject to punishment.

We hold that § 1346 cannot be applied retroactively to acts committed before its enactment regardless of whether such conduct occurred prior to *McNally. See United States v. Bush*, 888 F.2d 1145, 1145–46 (7th Cir.1989) (§ 1346 cannot be applied retroactively despite fact that "numerous incorrect decisions gave notice that the inferior courts would penalize" defendant's conduct prior to *McNally*). Because we hold that appellants' convictions under counts 5 and 11 for fraudulently obtaining export licenses from the Munitions Control Office cannot be sustained as violations of either 18 U.S.C. § 1343 or 18 U.S.C. § 1346, we reverse those convictions.

### B. *Fraud Against the Customs Service*

The government also contends that, even if the licenses are held not to be property for federal fraud purposes, the convictions of Berg and Schwartz under count 11 should be upheld because they attempted by fraud to regain possession of the arms Customs detained. While the government's assertion that *the arms* constitute tangible property is clearly correct, we disagree with the government's implicit argument that the Customs Service's interest in arms detained pending an investigation to determine whether or not to seize them formally rises to the level of a property interest protected by the federal fraud statutes. As in our earlier discussion, we hold that the Customs Service's interest in the arms detained at Kennedy Airport was not a property interest, but was merely ancillary to a regulatory interest.

The Customs Service detained the Poland-bound arms as they were about to be exported but did not formally seize the arms at that point. Rather, Customs held on to them and conducted an investigation over the next few days to determine whether to seize them. The detention of the arms was merely a preliminary step in the process whereby it would be determined whether the arms would be forfeited to the government. By holding the arms, Customs simply acted to aid the investigation that would determine whether the seizure process would be commenced. For these reasons, the Customs Service's interest in the detained arms was ancillary to its regulatory powers. Although Customs obtains a property interest protected by the fraud statutes at some point during the seizure and forfeiture of illegally exported arms, it had not yet done so in this case.

Thus, the convictions of Berg and Schwartz under count 11 for scheming to defraud the Customs Service of the arms detained at Kennedy Airport must be reversed.

## C. *Fraud against Litton*

 Appellants Schwartz, Berg, and Lisbona next argue that their convictions under the wire fraud statute for defrauding Litton in the purchase of the night vision devices for the Argentina Deal (count 2) must be reversed because Litton never suffered any economic harm. The basis of their argument is that the district court's charge to the jury permitted it to convict them under the invalid theory that appellants' deceitful representations were sufficient to establish a violation of the fraud statute. They contend that the fraud statutes require an intent to cause a pecuniary loss. The district court charged the jury, in part:

> While the government must prove the defendant contemplated harm in order to establish a scheme to defraud, it is not necessary that this harm be monetary in nature. It is sufficient if the contemplated harm goes to some essential element of the bargain.
>
> For example, you may find that the requirement of contemplated harm is satisfied if the defendants intended by fraud or misrepresentation to obtain from Litton Industries night vision equipment that Litton would not otherwise have sold to the defendants, were it not for the fraudulent representations.

We think the district court's charge was correct.

An essential element of the crimes of mail and wire fraud is a scheme to defraud. *See* 18 U.S.C. §§ 1341, 1343. To show a scheme to defraud, the government must present proof that defendants possessed a fraudulent intent. *United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987). It need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180–81 (2d Cir.1970). As a consequence, the deceit practiced must be related to the contemplated harm, and that harm must be found to reside in the bargain sought to be struck. *Id.* at 1182.

Judge Platt's instructions to the jury adequately conveyed the intent element of the fraud statutes. He stated that the government must prove defendants contemplated a harm, which need not be pecuniary in nature, but which would be proven if the jury found that defendants intended by their misrepresentations to obtain equipment that Litton would not have sold to them but for the fraudulent representations.

In both *Starr* and *Regent*, upon which appellants rely, the defendants' false representations were collateral to the bargain and did not cause any discrepancy between benefits reasonably anticipated and actual benefits received. Thus, the deceit did not go to an essential element of the bargain. *Starr*, 816 F.2d at 98–99; *Regent*, 421 F.2d at 1182.

In *Regent*, for example, the defendants made false representations to gain access to potential customers' purchasing agents, but they did not lie about the quality of their merchandise or falsely make promises or assurances in response to demands made by their customers as conditions for the sale. 421 F.2d at 1182. The facts of *Starr* are similar. There, defendants' scheme consisted of "burying" higher postage rate mail inside lower rate mailing sacks. By doing this, the defendants defrauded the post office by paying less postage than actually due and kept the difference, an offense for which they were not charged. Because the concealed higher postage rate mailings were apparently delivered with the same service as they would have been had the defendants paid the full postage, the customers were not deprived of the benefit of their bargain with the defendants. *See* 816 F.2d at 95–96. The scheme only defeated their customers' expectation that the money they paid to the defendants would be fully used to pay for postage, an expectation that was not the basis of the bargain. Hence, the convictions could not stand. *Id.* at 100–01.

Here, appellants misled Litton as to *explicit* promises made in response to Litton's demands. Litton made explicit its requirement that the equipment not be ex-

ported without proper permits and expressly demanded assurances from appellants that the purchased devices would not be used to violate the arms export laws and regulations. It required appellants to disclose the identity of their customer, provide information showing that appropriate documentation had been obtained by its customer, and have its customer promise not to export the night vision equipment until the customer received the proper export documents. A Litton executive testified at trial that if appellants had not been able to guarantee these conditions, Litton would not have sold its product to them. Thus, appellants' misrepresentations went to an essential element of the bargain between the parties and were not simply fraudulent inducements to gain access to Litton equipment.

Consequently, the fact that Litton was paid for its night vision goggles does not mean that Litton received all it bargained for. In fact, it did not. Litton insisted its product not be exported from the country illegally and defendants' conduct deprived Litton of the right to define the terms for the sale of its property in that way, and cost it, as well, good will because equipment Litton, a government contractor, sold was exported illegally. The fact that Litton never suffered—and that defendants never intended it—any pecuniary harm does not make the fraud statutes inapplicable. The record sufficiently demonstrates that Litton sold its products to appellants only because of their deceit and misrepresentations, which were offered as consideration for Litton to contract with them. Hence, appellants' convictions for wire fraud against Litton should be affirmed.

### D. *RICO Convictions*

■ The predicate acts of racketeering activity supporting appellants' RICO convictions under count 1 were the fraud against Litton alleged in count 2, the fraud against the Munitions Control Office alleged in count 5, and the fraud against that office and the Customs Service alleged in count 11. Reversal of the convictions on counts 5 and 11 leaves only one predicate act of racketeering activity. For this rea-

son, the RICO convictions under count 1 must also be reversed. 18 U.S.C. § 1961(5) (1988) (two acts of racketeering activity required for conviction).

### II The Authorization Defense

■ Berg, Schwartz, and Lisbona challenge their convictions on the charges arising from the Poland Deal (counts 10 through 14) on the ground that the district court erred in precluding their "authorization defense." Appellants claim their plan to fly the shipment of arms to Poland under an export license designating Mexico as the destination was "known, approved, and encouraged by high ranking officials" at the Department of Defense Intelligence Agency. Appellants collectively argue that they should have been allowed to testify regarding the authorization defense in their attack on counts 10 through 13.

Moreover, appellants Schwartz and Berg claim that even if the authorization defense was properly denied as to counts 10 through 13, it should have been allowed as a defense to count 14 that charged them with obstructing the Customs Service's proceeding at Kennedy Airport after the arms were detained. Additionally, appellants Berg and Lisbona urge that regardless of whether the authorization defense was properly denied to Schwartz, it was error to deny it to them.

### A. *Counts 10 through 13*

Counts 10 through 13 arise from actions Schwartz, Berg, and Lisbona took to deceive the Munitions Control Office as to the true destination of the arms on board the plane scheduled to go to Poland. They had applied for and received arms export licenses listing Mexico as the ultimate destination. Appellants contend the arms actually were destined for Mexico, to be used to supply the Contras during their insurgence in Nicaragua. They explain the plane's circuitous route to Poland was part of an intricate plan involving the Defense Intelligence Agency to obtain covertly two T-72 Warsaw Pact tanks from Poland. Appellants assert the flight to Poland was neces-

sary to establish a pattern of flying in and out of that country in order to facilitate smuggling out the tanks. In effect, they allege the flight from Kennedy was to accomplish two separate, covert, national security missions.

The government concedes that Schwartz was contacted by officials from the defense agency and enlisted to help them obtain the technologically advanced Soviet tanks. The officials, Col. Robert Bodroghy and James Hetrick, both testified they contacted Schwartz and engaged in preliminary discussions as to how to accomplish the proposed mission. They said Schwartz had told them it might be necessary to establish a pattern of flying in and out of Warsaw. But both of them stated—and appellants do not dispute it—that Schwartz never informed them he planned to send arms to Poland. Additionally, Schwartz testified he told Hetrick and Bodroghy that no arms would be sold to Poland or taken off the plane there and that Bodroghy had told Schwartz "if [Schwartz] was planning on transferring weapons to Poland in exchange for anything else that was illegal."

Appellants cannot now claim they were authorized to commit the charged crimes of attempting to sell weapons to Poland at the same time they admit telling the purported authorizing agents the arms were not going to Poland. While evidence of Schwartz's statements to Defense Intelligence Officials that it would be necessary to establish a pattern of flying into Warsaw would have been relevant regarding the credibility of defendants' assertions that the flight was stopping in Poland only for that purpose—not for the purpose of dropping off the arms—such evidence is not relevant to establishing an authorization defense for the crime of exporting arms to Poland. Thus, the district court properly denied the motion to present an authorization defense to counts 10 through 13.

### B. *Berg and Lisbona*

██ Berg and Lisbona urge they were entitled to an authorization defense, even if Schwartz was not, because they relied upon his representations that the shipment was authorized. This contention is without merit. Since Schwartz had no authority to authorize the crimes charged against them, Berg and Lisbona may not claim reliance on whatever account he might have given them. *See United States v. Duggan,* 743 F.2d 59, 83–84 (2d Cir.1984) (adopting requirement that official relied upon for authorization must have actual authority to interpret, administer, or enforce in relevant legal field).

### C. *Count 14*

Schwartz and Berg also argue that even if the authorization defense is unavailable for counts 10 through 13, it should have been allowed as a defense to the charge in count 14. Count 14 charged defendants with obstructing the Customs Service's investigation conducted after the arms destined for Poland were detained at Kennedy Airport. But, as with counts 10 through 13, appellants cannot claim the Intelligence Agency authorized lying to Customs officials when they told intelligence officials the same lie. Consequently, the motion to present an authorization defense on count 14 was properly denied.

### III 18 U.S.C. § 1505

██ Appellants Schwartz and Berg attack their convictions under count 14 on another ground: the Customs Service's interview with them was not an "agency proceeding" within the meaning of 18 U.S.C. § 1505 (1988). This claim was rejected by the district court on appellants' motion for acquittal. *United States v. Berg,* 710 F.Supp. 438, 445 (E.D.N.Y.1989).

The Customs Service detained the Poland-bound arms at Kennedy Airport on February 21, 1984. Over the next few days Customs continued to gather evidence against appellants, and held the interview in question for the purpose of determining whether or not to seize the shipment formally. During the interview, Schwartz and Berg lied to the Customs official as to the flight route of the plane and the ultimate destination of the arms shipment.

Appellants contend that the interview was not an agency proceeding under 18 U.S.C. § 1505, but a criminal investigation under § 1510.[3] They assert their deceptions could have been properly prosecuted under the latter statute, and they claim the indictment's failure to charge them under § 1510 renders their convictions under § 1505 invalid.

Section 1505 states, in pertinent part:

Whoever corruptly ... endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States ... [s]hall be fined not more than $5,000 or imprisoned not more than five years, or both.

The term "any proceeding" as used in § 1505 has been defined broadly. In *United States v. Browning, Inc.*, 572 F.2d 720 (10th Cir.), *cert. denied*, 439 U.S. 822, 99 S.Ct. 88, 58 L.Ed.2d 114 (1978), the Tenth Circuit held that the term "proceeding" encompassed both the investigative and adjudicative functions of a federal agency. *Id.* at 723–24 (citing *United States v. Fruchtman*, 421 F.2d 1019, 1021 (6th Cir.), *cert. denied*, 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed.2d 86 (1970)). In *Browning*, a conviction under § 1505 was upheld when the defendant, an arms importer, caused the submission of a false Entry Form to Customs. The defendant's argument that the Customs Service's investigation into the fraud was not a proceeding was rejected: "[T]he investigation or search for the true facts ... is not to be ruled as a non-proceeding simply because it is preliminary to indictment and trial." *Id.* at 724. *See also United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir.1976) ("administrative investigation is a 'proceeding' within the meaning of 18 U.S.C. § 1505"); *Fruchtman*, 421 F.2d at 1021 ("'proceeding' is a term of broad scope, encompassing both the investigative

and adjudicative functions of a department or agency").

Although there is some disagreement on this issue in the district courts in this Circuit, *compare United States v. Persico*, 520 F.Supp. 96, 101 (E.D.N.Y.1981) (I.R.S. investigation an agency proceeding under § 1505 though it was a criminal investigation) *with United States v. Mitchell*, 372 F.Supp. 1239, 1250–51 (S.D.N.Y.), *appeal dismissed*, 485 F.2d 1290 (2d Cir.1973) (§§ 1505 and 1510 mutually exclusive as to applicable government activities and chronological periods), we now hold that the Customs Service's investigation into whether it should formally seize the arms detained at Kennedy Airport was a "proceeding" under § 1505. Consequently, we conclude the Customs Service's interview of Berg and Schwartz falls within the meaning of a "proceeding" under § 1505.

### IV Evidentiary Rulings

We turn now to claims raised by Berg and DePanicis (and adopted by Lisbona and Schwartz) challenging certain evidentiary rulings made by the district court.

#### A. Exclusion of Post–Conspiracy Recorded Statements

Appellants assert that the convictions under counts 8 and 9 arising out of the government's Soviet Deal sting operation must be reversed because the district court erroneously precluded the defense from introducing exculpatory conversations between Ben Jamil, the government's informant, and Lisbona and DePanicis, recorded after the completion of the conspiracy charged in those counts.

The indictment alleged the Soviet Deal conspiracy ran from June 1983 to January 1984. The conspirators had an agreement to violate the law and committed an overt act, the shipment of the sample pair of goggles to West Germany in December 1983, in furtherance of the conspiracy dur-

---

**3.** The § 1510 prohibition against deception of a federal law enforcement officer relating to the commission or possible commission of a federal offense was transferred to 18 U.S.C. § 1512(a)(3) (1988), effective October 12, 1982, and thus applicable to the conduct involved

here. *See* Pub.L. No. 97–291, §§ 4, 9, 96 Stat. 1249–53, 1258 (1982). It is more likely that Schwartz and Berg violated § 1512(a)(3) since § 1510 prohibits the obstruction of criminal investigations "by means of bribery," of which there is no evidence in this record.

ing that time. *See United States v. Teitler*, 802 F.2d 606, 613 n. 2 (2d Cir.1986). Again, the conspiracy was complete prior to January 1984 and the exculpatory statements were recorded three months later, therefore they cannot be deemed to show defendants' state of mind during the period when the conspiracy was active. This is especially true considering that during the three-month period no acts in furtherance of the conspiracy were taken, two of the members of the conspiracy had been arrested, and the remaining two conspirators had expressed their concerns regarding government surveillance. Consequently, the district court did not abuse its discretion when it ruled the exculpatory statements irrelevant and precluded appellants from using them to cross-examine Jamil. *Cf.* Fed.R. Evid. 803(3) (hearsay exception for statement evincing declarant's *"then existing* state of mind … but not including a statement of memory"); *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir.) (particular deference is properly accorded to ruling of trial judge with respect to relevancy), *cert. denied*, 474 U.S. 825, 106 S.Ct. 82, 88 L.Ed.2d 67 (1985).

## B. *Jamil's Cross–Examination*

DePanicis further asserts his cross-examination of Jamil was improperly restricted and that the district court improperly rehabilitated Jamil before the jury. DePanicis challenges his convictions under counts 9 and 10, claiming he was denied his right to cross-examination guaranteed by the Confrontation Clause of the Sixth Amendment. He also contests his convictions contending the trial judge's actions evidenced and expressed to the jury a judicial bias in favor of the government in violation of the Due Process Clause. Berg, Schwartz, and Lisbona adopt his arguments. Specifically, appellants claim that particular avenues of cross-examination were closed by the district court, and such closure prevented them from fully presenting the theory of their defense to the charges arising from the Soviet Deal: these subjects were that Jamil was not trusted in the industry and would conceal the true identity of his customer, and that defendants played along

with him in an attempt to ascertain and steal his customer. We address each of these contentions in turn.

### 1. *The Cooperation Agreement*

DePanicis claims that the district court did not allow appellants to cross-examine Jamil about charges against him for arms dealing in an unrelated case that was dropped, thereby undermining his attempt to bring to light Jamil's real motive for cooperating with the government. Reading the transcript makes it clear that the trial judge did not prevent appellants from questioning Jamil about the dropped charges. Jamil's cross-examination was extensive, taking up 450 pages of the transcript, and DePanicis concedes that he was afforded "significant latitude" during it. Further, the trial court merely instructed the jury that dismissed charges are not evidence of guilt. There is no merit to defendants' argument that they were prevented from probing Jamil's motives for cooperating with the government. *Cf. United States v. Cruz*, 894 F.2d 41, 43 (2d Cir.) (abuse of discretion when curtailment of cross-examination denies jury "sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely"), *cert. denied*, —— U.S. ——, 111 S.Ct. 107, 112 L.Ed.2d 77 (1990), *quoting United States v. Blanco*, 861 F.2d 773, 781 (2d Cir.1988), *cert. denied*, 489 U.S. 1019, 109 S.Ct. 1139, 103 L.Ed.2d 200 (1989).

DePanicis also alleges the trial judge's interjections rehabilitated Jamil and evidenced the trial court's bias supporting both Jamil's credibility and the conclusiveness of the tape-recordings on the issue of guilt. Having reviewed the comments of which appellants complain in context, we do not think Judge Platt's comments vouched for Jamil's credibility or were in any event prejudicial to defendants. *See United States v. Pellegrino*, 470 F.2d 1205, 1206–08 (2d Cir.1972), *cert. denied*, 411 U.S. 918, 93 S.Ct. 1556, 36 L.Ed.2d 310 (1973).

### 2. *Prior Finding of Perjury*

DePanicis next asserts the trial court erred in ruling that a finding by

another district court—in an unrelated civil matter—that Jamil had committed perjury while testifying was inadmissible. Again, a review of the record reveals the trial court allowed defense counsel to ask Jamil whether he had committed perjury during the civil proceeding. Jamil conceded in cross-examination that the other district court judge found that he had, and upon then being asked whether he had in fact committed perjury, Jamil answered he had not. When counsel pursued the discrepancy between Jamil's answer and the district judge's finding to the contrary by rhetorically asking Jamil, "the judge was a liar?" Judge Platt interceded, stating:

> That is improper. That is improper. I should caution the jury, which I think I must in light of what I learned at the side bar, that this matter is still in litigation. There is a motion before Judge Connor with additional facts that have been given to him, I am informed, and the matter is under reconsideration by the judge. I think it is improper in light of what we instructed you not to do.

Defendants were able to put before the jury the fact of Jamil's alleged perjury. The district court's instructions simply added relevant information that was proper for it to consider. *Cf. Blanco*, 861 F.2d at 781–82 (court's curative instruction to jury in connection with admission of evidence of defendant giving false name and carrying false identification when arrested obviated prejudice evidence might have created). Any implicit limitation on further questioning was clearly within the trial court's discretion. *Cf. Cruz*, 894 F.2d at 43 (district court had discretion to refuse to admit evidence of finding by another court that witness was not credible).

### 3. *Remaining Cross–Examination Limitations and Rehabilitation*

DePanicis raises a number of other arguments concerning the restrictions on cross-examination and indications of judicial bias supporting the credibility of Jamil. He argues, for example, that the district court improperly "curtailed inquiry into Jamil's pattern of going bankrupt and his numerous corporate civil lawsuits." He also con-

tends that Judge Platt made improper comments that revealed his bias in favor of the government. After careful review of the record, we find all of these claims without merit. *See Cruz*, 894 F.2d at 43; *Pellegrino*, 470 F.2d at 1206–08.

### C. *Testimony of Agent Romeo*

■ DePanicis also disagrees with the ruling that permitted Agent Romeo—the Customs Service agent who supervised Jamil and the Soviet Deal investigation—to testify as to his interpretation of Lisbona's statements to Jamil during a recorded conversation in November 1983 that the transaction should be done "the legal way." Romeo testified in his years as a Customs Agent he had learned that the term "the legal way" referred to a method of shipping arms to an embargoed country by first sending them through a friendly country to which exports were permitted using End User Certificates designating the friendly country as the final destination.

The decision whether to admit expert testimony under Fed.R.Evid. 702 is, of course, left to the sound discretion of the trial judge and will not be set aside unless the ruling was "manifestly erroneous." *United States v. Diaz*, 878 F.2d 608, 616 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989); *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). We have held that expert testimony may be admitted to describe the illegal methods used by narcotics dealers because undercover government agents possess specialized knowledge beyond the ken of the jury on how drug dealers operate. *See United States v. Carson*, 702 F.2d 351, 369 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335, 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1335 (1983); *see also Nersesian*, 824 F.2d at 1308. Thus, the district court's decision to allow Romeo's testimony describing the various methods used to export arms illegally was not an abuse of its discretion.

■ Moreover, Romeo's testimony—that he continued his investigation in this case because he concluded that the defendants' manner of transshipment, as they described it to him, was illegal—did not run afoul of the rule enunciated in *United States v. Scop*, 846 F.2d 135, 142 (2d Cir.), *rev'd in part on reh'g*, 856 F.2d 5 (2d Cir.1988) (expert testimony improper because it embodied repeated legal conclusions). His statements were given not simply as an expert, but also as a witness to the investigation. It was inevitable that, in describing his own thought process as the investigation developed, he would be asked to comment on appellants' activities in this case and not just on illegal arms exports in general. His opinion that Lisbona's proposed actions were in fact illegal was hence relevant to explaining the direction of the investigation and in answering the very question first raised by appellants—that is, why Romeo chose to continue the investigation even though Lisbona termed his planned activities as "legal." It was not an abuse of discretion to permit Romeo to testify about the statements made by Lisbona and DePanicis or his interpretation that their plan to transship arms with false End User Certificates was illegal. *Cf. United States v. Brown*, 776 F.2d 397, 401–02 (2d Cir.1985), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *Carson*, 702 F.2d at 369.

## V Other Contentions

Appellants' other contentions with regard to conscious avoidance, similar act evidence, and immunity of a defense witness, have all been carefully considered. The district court correctly ruled on each of these issues and none of them was of sufficient merit to warrant discussion.

## VI Sentences

■ Finally, our reversal of the convictions of Schwartz, Berg, and Lisbona under counts 1, 5 and 11 requires that the sentences and fines imposed by the district court be examined. Each of these defendants received ten-year sentences under count 1 (conviction reversed); five-year sentences under counts 2, 4, 5 (conviction re-versed) and under 6 and 8, all running concurrently with each other and with the sentence imposed under count 1; five-year sentences under counts 10, 11 (conviction reversed), and under 12 and 14 (Lisbona was not convicted under count 14), all running concurrently with each other and with the sentence imposed under count 1, and running consecutively to the sentence imposed under counts 2, 4, 5, 6, and 8. In addition, two-year suspended sentences were imposed under counts 3, 7, 9 and 13. Hence, reversal of the convictions under counts 1, 5 and 11 eliminates significant portions of the district court's sentencing scheme. Because we are uncertain whether it would have imposed the same or somewhat lesser sentences for the remaining convictions as it did originally, we remand for reconsideration of sentencing in light of our disposition of this appeal. *United States v. Blackmon*, 839 F.2d 900, 916–17 (2d Cir.1988).

The district court also imposed fines and forfeitures on Schwartz, Berg, and Lisbona under counts 1, 5 and 11. Reversal of their convictions requires a reversal of those fines as well. Thus, the fines of $25,000 imposed under count 1 and $1,000 imposed under each of counts 5 and 11, and the $250,000 forfeiture imposed under count 1 are reversed. Imposition of the remaining fines is affirmed.

## CONCLUSION

Accordingly, the convictions of Schwartz, Berg, and Lisbona under counts 1, 5, and 11 are reversed and those counts of the indictment must be dismissed as against them. The convictions against all the appellants under the remaining counts of the indictment are affirmed.

Affirmed in part, reversed and remanded, in part, for resentencing.