**IN RE: Mark A. BRUNO**

**No. 3 JD 13**

Court of Judicial Discipline
of Pennsylvania

May 24, 2013

BEFORE: Honorable Bernard L. McGinley, P.J., Honorable Charles A. Clement, Jr., Honorable John R. Cellucci, Honorable Timothy F. McCune, Honorable Robert J. Colville, Honorable Carmella Mullen, JJ.

OPINION BY PRESIDENT JUDGE McGINLEY

### ORDER

AND NOW, this 24th day of May, 2013, upon consideration of the Judicial Conduct Board's Petition for Suspension of Respondent Without Pay, and of Respondent's Answer thereto, and of the Amended Petition of the Judicial Conduct Board for Interim Suspension of Respondent Without Pay, and of the testimony given and arguments made on April 8, 2013, upon the authority conferred on this Court in Article V, Section 18(d)(2) of the Pennsylvania Constitution, the said Petition is denied, and it is hereby ORDERED that the Respondent is suspended with pay until further Order of this Court.

This Order is effective as of February 1, 2013 and any compensation which has been

. withheld from Respondent since that date shall be immediately paid to him.

## I. INTRODUCTION

We have before us the Petition of the Judicial Conduct Board ("Board") for an Interim Order Suspending Respondent, Mark A. Bruno, From His Judicial Office Without Pay, filed January 31, 2013. The Petition is based on an Indictment filed on January 29, 2013 in the United States District Court for the Eastern District of Pennsylvania, charging Respondent with felonies. The Board seeks this order under Article V, § 18(d)(2) of the Pennsylvania Constitution. That section provides:

> Prior to a hearing, the court may issue an interim order directing the suspension, with or without pay, of any justice, judge or justice of the peace against whom formal charges have been filed with the court by the board or against whom has been filed an indictment or information charging a felony. An interim order under this paragraph shall not be considered a final order from which an appeal may be taken.[1]

In addressing the question whether we should act to enter an order of interim suspension with or without pay under Section 18(d)(2) in this case we also consider the Respondent's Answer to the Board's Petition as well as the testimony and arguments of counsel offered at a hearing held on April 8, 2013, We also will consider the Amended Petition for Interim Suspension Without Pay filed by the Board during the hearing on April 8, 2013.

## II. FINDINGS OF FACT

Findings of Fact are set forth in the Discussion.

## III. DISCUSSION

### A. ORDERS OF COURT OF JUDICIAL DISCIPLINE.

Because an Indictment has been filed against Respondent charging him with felonies, § 18(d)(2) of Article V of the Constitution authorizes this Court to enter an interim order now—prior to a hearing—suspending him with or without pay.

The constitutional amendments of 1993, establishing this Court of Judicial Discipline, invest this Court with authority to enter two different types of orders.

The first—the type we are most frequently requested to enter—is an order imposing a sanction against a judicial officer. This type of order is authorized by Article V, § 18(b)(5) of the Constitution and is to be entered in cases where the Board has filed formal charges, and only after "a hearing or hearings." Section 18(b)(5) also specifies certain rights to which judicial officers shall be entitled in such hearings. Orders under § 18(b)(5) are final and appealable.

The second type of order which the Constitution empowers this Court to enter is authorized by Article V, § 18(d)(2). These orders are styled by the Constitution as "interim orders" and are authorized to be entered "prior to a hearing." These or-

1. Thus, Section 18(d)(2) authorizes this Court to enter such an order in cases where a justice, judge or justice of the peace has been charged with a felony—whether or not the Board files a complaint in this Court, and also in cases where the Board files a complaint in this Court—whether or not the justice, judge or justice of the peace has been charged with a felony. The Constitution does not make this Court's authority to enter such interim orders conditional upon a request from the Board that we do so. Justices of the Peace are now known as Magisterial District Judges. See Pennsylvania Supreme Court Order dated January 6, 2005, effective January 29, 2005.

ders shall not be considered a final order from which an appeal may be taken.

■ As we did in *In re Melvin*, 57 A.3d 226, 231–39 (Pa.Ct.Jud.Disc.2012) and in *In re Jaffe*, 814 A.2d 308, 311–18 (Pa.Ct. Jud.Disc.2003), we hold that the rights set out in § 18(b)(5) as available to judicial officers in proceedings leading to final orders of sanctions are not available in interim proceedings under § 18(d)(2). The fundamental constitutional scheme negates any other conclusion. We also hold that that constitutional scheme in no way offends any overweening notion of due process which may be said to derive from the Constitutions of the United States or of Pennsylvania. *See, also,* cases cited in the *Melvin* and *Jaffe* opinions, esp. *Gilbert v. Homar*, 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997).

## B. INTERIM SUSPENSION WITH OR WITHOUT PAY?

Having decided that this Court is constitutionally authorized to enter an interim order without a hearing and that, in fact, the Constitution contemplates that we do so where appropriate, and that such a procedure does not withhold or offend any due process rights to which Respondent might be entitled, we must decide whether, in our discretion, an interim order suspending Respondent without pay should be entered in this case.

### 1. *Totality of the Circumstances—Factors to Consider.*

In this undertaking, we turn to the rule formulated by this Court in *In re Larsen*, 655 A.2d 239 (Pa.Ct.Jud.Disc.1994) where we stated:

> Rather than a *per se* rule as proposed by the Board, we are of the opinion that a totality of the circumstances test is more appropriate, with each case being decided on its own facts. Among the factors

to be considered are the nature of the crime charged, its relation, or lack thereof to the duties of the responding judicial officer, the impact or possible impact on the administration of justice in this Commonwealth, the harm or possible harm to the public confidence in the judiciary as well as any other circumstances relevant to the conduct in question.

*Id.* at 247. *See, also, In re Smith,* 712 A.2d 849, 851–52 (Pa.Ct.Jud.Disc.1998).

■ Consideration of the annunciated factors leads decisively to the conclusion that the totality of the circumstances in this case calls for the entry of an interim order of suspension with pay—and not for suspension without pay, as requested by the Judicial Conduct Board.

In reaching this decision—in determining the "totality of the circumstances"—we will examine:

—the nature of the crime charged and its relation, or lack thereof to Respondent's judicial duties,

—the impact or possible impact on the administration of justice,

—the harm or possible harm to the public confidence in the judiciary,

—any other circumstances relevant to the conduct in question.

It cannot be gainsaid that the crime charged does relate to the everyday duties of a judicial officer and we believe that, if Respondent were to continue to hear cases while the charges are unresolved, there could be a possible negative impact on the administration of justice and could possibly harm the public confidence in the judiciary. As a consequence, so long as the charges are pending and unresolved, interim suspension is called for.

In coming to grips with the question whether suspension with pay is appropri-

ate and sufficient to allay the possible harm to public confidence in the judicial system and the possible negative impact on the administration of justice in the Commonwealth, in this case we look not only at the nature of the charges, but also at "any other circumstances relevant to the conduct in question."

#### (a) *Nature of the Charges.*

We will start by looking at the nature of the charges. And we will start that exercise with reference to the original Petition for Interim Suspension Without Pay filed by the Board on January 31, 2013. In that Petition the Board made the grossly inaccurate representation that the federal Indictment (which was attached as Exhibit "A" to the Petition) charged this Respondent with one count of conspiracy, 49 counts of wire fraud and 18 counts of mail fraud—a total of 68 crimes (see para. 6 of the original Petition). The fact is that the Indictment charges this Respondent with a total of 3 counts—not 68—one count of conspiracy, one count of wire fraud and one count of mail fraud.[2]

#### i. *The Conspiracy Count.*

Closer review of the Indictment reveals much about the nature of the charges against Judge Bruno as well as the level of his participation in the everyday goings-on at the Philadelphia Traffic Court which the federal prosecutors and media like to

call—not without some justification (at least according to the allegations)—a "culture" of corruption.

Any review of the totality of the circumstances in this case must include the realization that this Respondent was not a regular "traffic court judge"—he was not a judge of the Philadelphia Traffic Court. He was a magisterial district judge elected in Chester County. He went to Traffic Court once a year to help out when the Traffic Court judges left town for one week for their annually required continuing legal education given in Chambersburg or Harrisburg, As a matter of fact the Indictment asserts that the regular Traffic Court judges were chary of Judge Bruno and the other magisterial district judges and found it difficult, challenging, risky to get illegal things done during the week Bruno and the other magisterial district judges were in Traffic Court. See, e.g., para. 39–41 at p. 29 of the Indictment. In those paragraphs it is alleged:

39. On or about May 10, 2010 [a Monday], defendant MICHAEL J. SULLIVAN [3] continued the hearing for the two Oasis tickets.

40. On or about May 12, 2010 [a Wednesday], defendant MARK BRUNO adjudicated L.R.'s citations as not guilty.

41. On or about May 18, 2010 [Tuesday of the following week], Fortunato N. Perri, Sr.[4] and defendant HENRY P.

---

**2.** This Court does not assert, or even imply, that this was anything other than a mistake on the part of the Board—an unintentional inadvertence. This is borne out by the Board's prompt revision of the Petition once the mistake was discovered. That is not to say, however, that this mistake may not have led to unintentional consequences where this Respondent is concerned.

**3.** Michael Sullivan was elected judge of Philadelphia Traffic Court in November 2005 and took the bench on January 5, 2006. On April 27, 2011 he was appointed Administrative

Judge and served in that capacity until December 19, 2011. See Indictment, para. 15 at p. 6. The Indictment goes on to charge that Sullivan participated in "ticket fixing" on a regular basis. See Indictment esp. pp. 57–63 and 64–66.

**4.** Fortunato N. Perri, Sr. was a Senior Judge on Philadelphia Traffic Court ("Traffic Court"). He was first appointed to fill a judicial vacancy on Traffic Court in 1997, and served as the Administrative Judge of Traffic Court from 2000 until 2002. He became a Senior Judge in 2007 and as such was eligible

ALFANO discussed the continuance on the Oasis tickets. Perri explained that the district justices were sitting the previous week and all the judges were away and therefor maybe Perri "couldn't get it through, you know what I mean?" Defendant ALFANO responded "I gotcha. I got the picture." Perri instructed ALFANO to mail Perri any notices.[5]

The obvious import of Perri's conversation with Alfano on May 18, 2010 was to explain to Alfano that the necessity of continuing the cases on Monday, May 10 was because "the district justices [which would include Judge Bruno] were sitting the previous week" and, consequently, Perri "couldn't get it through, you know what I mean?" In other words, business as usual couldn't be done that week—because "all of the [regular] judges were away" and the "district justices were sitting," (which would include Judge Bruno); and their (and his) very presence prevented the execution and furtherance of the grand conspiracy described in this Indictment. It is evident that Perri's explanation to Alfano does nothing by way of implicating this Respondent in the fixing of any ticket—much less of being a participant in a "culture" of corruption or in the "conspiracy" described in this Indictment. Instead, it weighs heavily to disimplicate him from any such participation.

The only connection to the alleged "fixing" of these tickets issued to Oasis and L.R. which were the subject of conversations between Perri and Alfano (see Indictment para. 35–47 in the Overt Acts section) is the allegation in para. 40 that "On May 12, 2010, defendant Mark Bruno adjudicated L.R.,'s citations as not guilty." There is no allegation that Perri, Alfano, or anyone else spoke to Bruno about those citations nor any allegation that Bruno was asked by anyone to enter an adjudication of not guilty irrespective of the facts of the case. As a matter of fact, who is to say that Judge Bruno's finding was anything other than the delivery of justice in the case? The federal prosecutors *imply* otherwise but they have fashioned no allegation upon which a finding can legitimately be made that Judge Bruno's finding was corrupt—or even incorrect.[6]

to accept assignments on Traffic Court when his services were requested, and kept in regular contact with Traffic Court administrators. (See para. 1 of p. 1 of Exhibit "A" to the Information filed against Fortunato N. Perri, Sr. which is attached to the Judicial Conduct Board's Petition for Perri's Interim Suspension.)

In the Information filed against Perri it is alleged that Perri had a close relationship with Henry P. Alfano. Alfano owned an automobile salvage company called Century Motors, Inc., located at 3101 S. 61st Street, Philadelphia, Pennsylvania. Also, Alfano was the landlord for two gentlemen's clubs in Philadelphia: The Oasis Gentlemen's Club (hereinafter "Oasis"), located at 6800 Essington Avenue, Philadelphia, Pennsylvania; and Christine's Cabaret (hereinafter "Christine's"), located at 6130 Passyunk, Philadelphia. (See para. 4 of p. 2 of Exhibit "A" to the Information filed against Fortunato N. Perri, Sr. which is attached to the Judicial

Conduct Board's Petition for Petri's Interim Suspension.)

The Information further alleges that Perri participated in "ticket fixing" on a regular basis—mainly to benefit Alfano and his drivers. It further alleges that in return for Perri's assistance with Traffic Court matters, he received a stream of benefits, including free car repairs, free car maintenance and car towing, free landscaping services, free videos, and free food from Henry P. Alfano, (See para. 7 of p. 3 of Exhibit "A" to the Information filed against Fortunato N. Perri, Sr. which is attached to the Judicial Conduct Board's Petition for Perri's Interim Suspension.)

5. The allegations of this paragraph are also made in para. 11 at p. 22 of the Indictment.

6. People can and frequently do disagree about whether a judge's decision is correct; judges often disagree with other judges, and appel-

Review of this 79 page Indictment will reveal only one other reference to any contact of any kind this Respondent had with any of the eleven others named as conspirators in this Indictment. That reference is found in paragraphs 18 and 19 on page 24 of the Indictment. The paragraphs allege:

18. In a telephone conversation on or about January 14, 2011, defendant MARK A. BRUNO and Fortunato N. Perri, Sr. discussed "fixing" a citation received by J.M. Perri offered to "look into it," stating that he still "got a little connections." During the call, Perri took credit for "putting" defendant BRUNO in Traffic Court to preside over cases.

19. In calls after on or about January 14, 2011, Fortunato N. Perri, Sr. discussed defendant MARK. A. BRUNO's request to "fix" J.M.'s ticket with defendant WILLIAM HIRD. Both defendant HIRD and Perri discussed measures to remove any points assessed on the ticket.

One reading the entire Indictment goes away puzzled by these allegations about J.M.'s ticket because J.M.'s ticket is not mentioned again. There is no allegation that the ticket was "fixed"; there is no allegation that points were somehow illegally "removed." At a hearing held by this Court on April 8, 2013, Vincent DiFabio, Esquire, who is representing Respondent in the criminal case, testified that J.M. *was found guilty* in Traffic Court of the violation cited on the ticket, and thereafter appealed the finding of guilty to common pleas court where he was found guilty of an offense upon which were assessed no points.

Inasmuch as the United States attorneys went nowhere with this ticket—there was, it appears, no place to go—one wonders why it is mentioned at all. The only explanation we can divine is that the United States attorneys recognized that allegations critical to the establishment of the crimes charged in connection with the L.R. tickets are not to be found in this Indictment and in consequence the likelihood of obtaining convictions of this Respondent of those crimes was in serious question. In that circumstance they decided to include paragraphs 18 and 19 because paragraph 18 does allege that Bruno talked to Perri on one occasion, and talking to each other is something conspirators are known to commonly do—so they decided that maybe it would help to establish that Bruno was a conspirator. But there was no wrongdoing associated with that conversation: J.M. was found guilty. In addition to which we don't know who said what in that conversation, the context in which it occurred, nor what will be Perri's and Bruno's version of events. These are circumstances which militate emphatically against a suspension without pay "prior to a hearing."

Moreover, given the very limited scope of the conversation referred to in paragraph 18, and, given that that conversation was the only contact of any kind that Bruno is alleged to have had with anybody in this Indictment,[7] it would be reasonable to consider that the evidence of that conversation falls decidedly short of establishing this Respondent's participation in the pervasive, expansive, truly impressive conspiracy described in the Indictment. This is especially true when viewed alongside the evidence in the Indictment (discussed earlier) that the illegal activities routinely

late judges routinely reverse decisions made by lower court judges; but that does not make the lower court judge a criminal.

7. Remember, there is no allegation that Bruno had any conversation or contact with anybody regarding the L.R. tickets.

carried out by the regular traffic court judges and the other named conspirators ceased or was seriously impeded by the mere presence of the magisterial district judges (including this Respondent) during the week the regular traffic court judges were away.

### ii. *The Mail Fraud Count.*

We direct our attention now to the allegations in the Indictment made to support the one count of mail fraud and the one count of wire fraud with which Respondent is charged. First we note that the two counts involve the same facts, i.e., the two citations of L.R. discussed above. The "Overt Act" set out in the Indictment to establish the mail fraud charge against this Respondent (Indictment, p. 65, Count 54) is stated to be " 'Receipt' mailed." The salient fact here is that Bruno is not alleged to have mailed this "Receipt" or any "Receipt." The Indictment alleges that *Perri* mailed it. See Indictment, para. 43, p. 30 and para. 3, pp. 64–65 (Count 54).

In a filing styled "Guilty Plea Memorandum" filed in the case of *U.S. v. Fortunate N. Perri, Sr.,* U.S.D.C.E.D.Pa., Criminal No 13–47–1, the United States Attorney's Office presents a précis of the elements necessary to establish the crime of mail fraud. The government's Memorandum recites that the mail fraud statute (18 U.S.C. § 1341) provides:

B. The elements of *mail fraud,* in violation of 18 U.S.C. § 1341, are:

1. The defendant devised, and aided and abetted the devising, of a scheme to defraud or obtain money or property by means of false or fraudulent pretenses, representations or promises, and

2. The defendant, for the purpose of executing the scheme, knowingly took

and received from an authorized depository for mail matter, and caused to be delivered by mail any matter or thing at the place at which it is directed to be delivered by the person to whom it is addressed.

Guilty Plea Memorandum pp. 3–4, IV. Elements of the Offenses, B. The Memorandum then proceeds to dissertate on how the language of the statute has been interpreted. It is pointed out that:

It is not necessary that the scheme contemplate the use of the mails as an essential element, nor is it necessary for the government to show that the defendant mailed anything, as long as he caused it to be mailed. "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used," *United States v. Pereira,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

In the cited case, Pereira had scammed a large sum from Mrs. Joyce. In Texas she gave him a check drawn on her account with a bank in California. Pereira, himself, did not place the check in the mail, but the Supreme Court pointed out that:

When Pereira delivered the check, drawn on an out-of-state bank, to the El Paso bank for collection, he "caused" it to be transported in interstate commerce. It is common knowledge that such checks must be sent to the drawee bank for collection, and it follows that Pereira intended the El Paso bank to send this check across state lines.

*U.S. v. Pereira, supra,* at 9, 74 S.Ct. at 363, 98 L.Ed. at 444–45.[8]

8. The interstate requirement was present in the *Pereira* case because he was also charged

with a violation of the National Stolen Property Act of which transporting the property in

Here the situation is just the opposite: Bruno is alleged to have had neither specific nor actual knowledge of the mailing of the L.R. "Receipt" nor "common knowledge" that it would be mailed in the ordinary course of business because he *could not* have had common knowledge that it would be mailed in the ordinary course of business because these "Receipts" were *never* mailed in the ordinary course of business of the Traffic Court. This is known to be a fact because the Indictment so avers. Paragraph 42 at p. 14 states:

> Typically, after a citation was adjudicated, defendant WILLIAM HIRD provided a computer printout from the Traffic Court computer system of the case disposition to Fortunato N. Perri, Sr., which Perri referred to as a "receipt." Perri, in turn, mailed these "receipts" to defendant HENRY P. ALFANO or directly to the ticketholder as confirmation that the citation had been dismissed or otherwise disposed of. These "receipts" were not provided in the regular course of business by Traffic Court to ticketholders.

In addition, in the "Guilty Plea Memorandum," *supra,* in Section V. Evidence In Support of the Charges, the United States attorneys state:

> After a citation was adjudicated, Hird often provided a computer printout from the Traffic Court computer system of the ease disposition to Perri, which Perri referred to as a "receipt." Perri, in turn, mailed or gave these "receipts" to Alfano, M.D. or A.D., or directly to the ticketholder as confirmation that the citation had been dismissed or otherwise disposed of. These "receipts" were not provided in the regular course of business by Traffic Court to ticketholders.

Thus, it appears that the Indictment, on its face, fails to allege facts sufficient to establish the mail fraud count for there is no way Bruno could "foresee" that Perri would decide to send computer printouts from the Traffic Court computer system showing the case disposition as an accommodation to Alfano—nor is there an allegation that he should have foreseen that improbable happenstance. In these circumstances, it seems that Bruno's conviction of mail fraud is anything but a sure thing.

There is yet another reason why conviction of this Respondent of mail fraud actually appears to be improbable. Improbable because several cases appear to stand in the way of conviction. The most noticeable of these eases is *United States v. Walter Cross, Jules Melograne and Nunzio Melograne,* 128 F.3d 145 (3d Cir.1997).

Jules Melograne was a judge on the Statutory Appeals Court in Allegheny County which exercised *de novo* review of traffic offenses. Cross was the supervisor of the court and Nunzio Melograne was a tipstaff in that court. They were charged with "fixing" traffic tickets so as to achieve "Not Guilty" dispositions in some cases and "Guilty" dispositions in some cases. They were convicted of conspiracy to deprive Pennsylvania residents of their civil right to a fair trial and of conspiracy to commit mail fraud. On appeal, the United States Court of Appeals for the Third Circuit affirmed the convictions to deprive residents of their civil rights but *reversed* the convictions of conspiracy to commit mail fraud.

In its opinion the United States Court of Appeals for the Third Circuit noted that the defendants had been convicted of a

---

interstate commerce is an essential element. The crime of mail fraud by itself does not require that the mailing be interstate.

conspiracy that contemplated using the United States mail to deprive the Commonwealth of Pennsylvania and its citizens of the honest services of public employees and that the Indictment alleged that the conspiracy contemplated that the defendants would cause notices of the disposition of cases to be sent through the mail to the parties and to the Department of Transportation, The court held that:

> We cannot uphold the defendants' mail fraud convictions ... because any deprivation of the honest services of public employees had been completed in each instance before notice of the disposition was mailed, the mailings of notices of case disposition as a matter of law were not in furtherance of the alleged conspiracy.

*United States v. Cross and Melograne,* *supra* at 150. The court of appeals pointed out that:

> The mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is part of the execution of the fraud. [Citing] *Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 89 L.Ed. 88 (1944).

The court then cited its own opinion *United States v. Tarnopol,* 561 F.2d 466, 471–72 (3d Cir.1977) and quoted the following portion of that opinion.

> In each case the question is whether or not the "mailings were sufficiently closely related to respondent's scheme to bring his conduct within the statute." Moreover ... "the close relation of the mailings to the scheme does not turn on time or space, but on the dependence in some way of the completion of the scheme or the prevention of its detection on the mailings in question." *Thus, mailings taking place after the object of the scheme has been accomplished,* or before its accomplishment has begun, *are not sufficiently closely related to the scheme to support a mail fraud prosecution.* (Emphasis added.)

*Id. See, also, Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960) and *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). *Maze* is instructive for there Maze stole a credit card and used it when he checked into a motel. The Supreme Court held that the subsequent mailings of the credit card invoices to a bank by the motel for payment of Maze's evening there were not "for the purpose of executing [the defendant's] scheme." *Id.* at 405, 94 S.Ct. 645. The court pointed out that "Maze's scheme reached fruition when he checked out of the motel." *Id.* at 414, 94 S.Ct. 645. Following the Supreme Court's reasoning, in *Cross and Melograne,* the Third Circuit held that:

> [The] objective [of depriving citizens of the honest services of public employees] would "reach fruition" when the defendants' efforts caused a different disposition by the court than would otherwise have been made. In short, all that the conspirators needed to fix in order to achieve the object of their agreement was the disposition of a case ... by the time notices or dispositions were dispatched, the conspiracy had either succeeded or failed, the legal consequences of an acquittal or conviction had been established, and the routine reporting of the dispositions simply was not a part of the conspirators' execution of their scheme.

*Id.* at 151–52. So it is here: the object of the conspiracy to commit mail fraud is the same—exactly the same—as in *Cross and Melograne,* namely, "to cause a different disposition by the court than would otherwise have been made." Once that was accomplished any mailings that followed simply were not made "for the purpose of

executing the scheme," see 18 U.S.C. § 1341. Thus, we see *United States v. Cross and Melograne* as a substantive impediment to a conviction of this Respondent on the conspiracy to commit mail fraud and on the mail fraud count.

### iii. *The Wire Fraud Count.*

Turning now to the wire fraud count, the elements of that crime are:

1.  The defendant devised or intended to devise a scheme or artifice
    a.  to defraud, or
    b.  to obtain money or property by means of false or fraudulent pretenses, representations or promises, and
2.  for the purpose of executing the scheme or artifice or attempting to do so,
3.  the defendant knowingly caused to be transmitted by means of wire communications in interstate commerce, writings, signs, and signals.

18 U.S.C. § 1343.

The Indictment alleges the Overt Act providing that essential element in establishing wire fraud is an "Interstate telephone call" made on March 8, 2010. See Indictment, para. 3, pp. 57–58 (Count 4). That interstate telephone call is described in para. 37 on pp. 29–30 of the Indictment as follows:

> On or about March 8, 2010 [a Saturday] in an interstate telephone call between Fortunato N. Perri, Sr., in Pennsylvania, and defendant HENRY P. ALFANO, in New Jersey, Perri told defendant ALFANO that there were four tickets and "you'll take care of that with me." Perri instructed ALFANO that the owner and the driver should go to the Boot and Tow window at Traffic Court, ask for D.H., and state that "they're there to pick up the bus [and] to get the bus released." Perri further instructed AL-

FANO that defendant MICHAEL J. SULLIVAN would "waive the collateral on the four tickets [and] they don't have to post that money." Lastly, Perri said, "and then you'll give me those four matters," referring to the citations.

This call is alleged to have been between *Perri* and *Alfano.* The Indictment contains no allegation that this Respondent was a participant in the call or knew anything about it. But, as the federal prosecutors emphasize in their "Guilty Plea Memorandum" filed in the case of *U.S. v. Fortunato N. Perri Sr., supra* :

> The government is not required to prove that the defendant actually used a wire communication in interstate commerce or that he even intended that anything be transmitted in interstate commerce by means of a wire ... communication to further, or to advance, or to carry out the scheme.

*Id.* at 4–5, n. 3. However, further explaining the elements of the federal crime of wire fraud, the Memorandum goes on to say that:

> The government must show *that the defendant knew that the use of the wire communication would follow in the ordinary course of business or events,* or that the defendant should have anticipated that the wire communication in interstate commerce would be used. [Citing:] Third Circuit Instructions at 6.18.1343–1. (Emphasis added.)

The Indictment contains no allegation that Petri's call to Alfano was made in the ordinary course of business so that Bruno should have reasonably foreseen "that the wire communication in interstate commerce would be used." The obvious reason no such allegation is made in this case is that no such allegation is remotely supportable: Petri's call to Alfano described in paragraph 37 on pages 28–29 of the

Indictment certainly cannot be credibly alleged to have been made in the ordinary course of business of the Traffic Court. The fact is that any allegations pertaining to foreseeability that the call would be made, and that it would be an interstate call—proof of which is essential in establishing the crime of wire fraud—are simply absent from this Indictment. These circumstances constitute substantive impediments to Bruno's conviction of wire fraud.

### iv. *Mail Fraud and Wire Fraud: Establishment of a "Property Right" Required*

■ In order to establish the crimes of mail fraud (18 U.S.C. § 1341) or wire fraud (18 U.S.C. § 1343) the government must prove the existence of "a scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations or promises."

The government describes the way the Traffic Court operated in the indicated paragraphs of the Indictment as follows:

5. The Traffic Court judges presided over and adjudicated moving violations, commonly referred to as traffic tickets or citations, occurring within Philadelphia, issued by the Philadelphia Police Department and the Pennsylvania State Police and other police entities. Traffic Court was responsible for the collection of fines and court costs resulting from guilty pleas and findings of guilt for violations of the Pennsylvania Motor Vehicle Code.

6. On a daily basis, ticketholders appeared before Traffic Court judges for their trials. . . . The trials involved an appearance by the ticketholder contesting his or her guilt and either an officer from the Philadelphia Police Department, a State Trooper, or another law enforcement officer, who prosecuted the ticket.[9]

7. Traffic Court judges had several options when disposing of citations, including finding the ticketholder guilty of a different offense, guilty, not guilty, not guilty in *abstentia*, guilty in *absentia*, guilty with reduction in speed, and dismissal.

8. *Guilty adjudications subjected a violator to statutorily determined fines and costs of court, as well as possible statutorily mandated "points" on a driving record.* The Pennsylvania Department of Transportation (PennDOT) mandated a point system to help improve driving habits and to ensure safe driving in Pennsylvania. Upon a guilty adjudication of certain traffic offenses, . . . PennDOT assigned "points" to the ticketholder's driving record. PennDOT also imposed sanctions, such as a license suspension, when a ticketholder accumulated a certain number of points on his or her driving record. (Emphasis added.)

It is noted that only in cases of guilty pleas or adjudications are the fines and costs owed or the points assessed.[10]

It is settled federal law that in order to establish a violation of the mail fraud or wire fraud statutes[11] it must be shown

---

9. This setup happens to be unconstitutional. *See, In re Marraccini*, 908 A.2d 377 (Pa.Ct. Jud.Disc.2006), concurring opinion of Judge Sandler, and cases cited and discussed therein.

10. This assertion is so obviously true, one may wonder why we bother to say it: the answer is because the government is saying it is *not true;* the government is saying the fines and costs are owed and the points earned *before* a finding of guilt!

11. The language of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud) is identical and has been interpreted so, the cases on one providing precedent for cases on the other.

that the scheme was designed to defraud the victim of a legally recognized, vested property right. *Cleveland v. United States*, 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000); "We conclude that § 1341 requires the object of the fraud to be 'property' in the victim's hands." *Id.* at 26, 121 S.Ct. 365; *Pasquantino v. United States*, 544 U.S. 349, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005); *United States v. Gimbel*, 830 F.2d 621 (7th Cir.1987). It is also settled that a regulatory interest of a state or governmental agency is not "property" such as would be within the scope of § 1341. *See, Cleveland, supra* at 20–25, 121 S.Ct. 365; *United States v. Schwartz*, 924 F.2d 410, 416–18 (2d Cir.1991); *United States v. Mariani*, 90 F.Supp.2d 574, 583–84 (M.D.Pa.1990); "we hold that the government's interest in the unissued export licenses is ancillary to its power to regulate and is not a property interest within the meaning of the wire fraud statute," *United States v. Schwartz, supra* at 418.

Given the narrow definition of what constitutes "property" under the mail fraud and wire fraud statutes as in the cases cited above, the government here has made a noticeably weak effort to identify the "property" of which it claims the victims were being deprived so that it would be within the scope of the definition. That effort is made in paragraph 38 (p. 13) of the Indictment where it is averred that:

> . . . defendants were depriving the City of Philadelphia and the Commonwealth of Pennsylvania of money which would have been properly due as fines and costs, as well as depriving the Commonwealth of property in the form of the Commonwealth's ability to regulate safe drivers on its roadways through licensing suspensions and revocations.

*Pasquantino, infra* at 355, 125 S.Ct. 1766; *United States v. Gimbel, infra* at 627; *United*

As can been seen, paragraph 38 identifies two types of "property":

> 1. "money which would have been properly due as fines and costs," (the City and the Commonwealth are assigned to be the victims), and
> 2. "property in the form of the Commonwealth's ability to regulate safe drivers on its roadways through licensing suspensions and revocations," (the Commonwealth is the victim on this one).

As to 1.: The City and the Commonwealth have no property interest in fines and costs prior to a determination of guilt.

In *United States v. McNally*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the United States Supreme Court held that "the mail fraud statute, as we have indicated, had its origin in the desire to protect individual property rights, and any benefit which the Government derives from the statute must be limited to the Government's interests as property holder." *Id.* at 359, 107 S.Ct. 2875.

The court went on to say:

> We believe that Congress' intent in passing the mail fraud statute was to prevent the use of the mails in furtherance of such schemes. The Court has often stated that when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language. [Citations omitted.] . . . Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property

*States v. Schwartz, infra* at 416.

rights. If Congress desires to go further, it must speak more clearly than it has.[12]

In *United States v. Pasquantino, supra,* the defendant had imported (smuggled) alcoholic beverages into Canada. The importation of alcoholic beverages was subject to excise taxes in that country. The Supreme Court held that the uncollected excise taxes, became a legal obligation of defendant when the liquor came across the border and held that:

> Canada's right to uncollected excise taxes on the liquor petitioners imported into Canada is "property" in its hands. This right is an entitlement to collect money from petitioners, the possession of which is "something of value" to the Government of Canada.... Had petitioners complied with this legal obligation, they would have paid money to Canada. Petitioners' tax evasion deprived Canada of that money, inflicting an economic injury no less than had they embezzled funds from the Canadian treasury. The object of petitioners' scheme was to deprive Canada of money legally due, and their scheme thereby had as its object the deprivation of Canada's "property."

*Id.* at 355–56, 107 S.Ct. 2875. Thus, the taxes became due and were owed once the liquor entered Canada—nothing further was required for the taxes to be *"legally due."*

In contrast is the case of *United States v. Gimbel, supra.* In that case the government was seeking conviction under the mail fraud statute and argued that: "because Gimbel's scheme concealed information from the Treasury Department which, if disclosed, might have resulted in the Department assessing tax deficiencies,

Gimbel was in effect depriving the Treasury of tax revenues." *Id.* at 626.

The Seventh Circuit rejected the government's position and held that any interest the Treasury Department might have had was too attenuated to qualify as "money or property" under § 1341. Before any legal obligation to pay the taxes could attach so as to be considered money in the government's hands, the Treasury Department would have to assess the tax deficiencies, which it had not done. The Circuit Court considered that *Gimbel* was governed by *McNally* where the defendants were charged with mail fraud because they "failed to disclose their financial interests ... to other persons in the state government whose actions could have been affected by the disclosure ... [and who] might have taken action to recoup payments made to the insurance brokerage firm," which they had not done. The Supreme Court held that the government had not established that the government had been deprived of money or property within the meaning of § 1341.

In *United States v. Mariani, supra,* the defendant was charged with mail fraud for engaging in a scheme to deprive the Commonwealth of a statutorily imposed penalty for accepting waste at a landfill in excess of daily limits. The court held that the government had not been deprived of any property under § 1341 because "... the government has not proffered any evidence that DEP has commenced penalty assessment proceedings for the alleged acceptance of waste in excess of daily limits at issue here. It is troubling that what the government asserts is a mandatory penalty remains unimposed several years after the discovery of the alleged fraud." *Id.* at

---

**12.** In *Cleveland, supra,* the Supreme Court essentially reiterated this approach to interpretation of the word "property" in § 1341.

583, n. 5. "The penalty ... does not accrue until assessed and it appears that DEP has discretion as to whether to assess the penalty. In other words, the Commonwealth does not have a property interest in the penalty until and unless it is assessed." *Id.* at 583, n. 6.

All of the cases[13] have one thing in common—and in common with the government's case against Bruno, i.e., in each the courts held that the government had failed to establish that the victim had been deprived of property, or of a property interest that satisfied the requirements of the mail and wire fraud statutes because *something remained to be done* before a qualifying legally enforceable right could attach:

In *Gimbel*, it remained for the Treasury Department to assess tax deficiencies, which it had not done.

In *McNally*, it remained for the state officials to take action to recoup the payments which the state had made to the insurance brokerage firm, which they had not done.

In *Mariani*, it remained for the DEP to commence penalty assessment proceedings, which it had not done.[14]

In this case (*U.S. v. Bruno*) it remains for the government to establish (and, as a matter of fact, to allege) that the ticketed citizens were adjudged guilty, for it isn't until that finding is made that those citizens have a legal obligation to pay fines and costs associated with some crime. Neither the City nor the Commonwealth is legally entitled to fines and costs from an *alleged* traffic offender.

It is hard to see how the government will be able to establish that the City and Commonwealth have been deprived of property or of a property right within the meaning of the mail and wire fraud statutes in this case, especially when it hasn't even alleged it. An adjudication of guilty is a prerequisite; and it hasn't been alleged because it *can't* be alleged. It didn't happen.

As to 2. The Commonwealth's interest in license suspensions and revocations is ancillary to its power to regulate, and is not a property interest.

In *United States v. Schwartz, supra,* the court said:

> ... we hold that the government's interest in the unissued export licenses is ancillary to its power to regulate, and is not a property interest within the meaning of the wire fraud statute.

924 F.2d at 418.

In *Cleveland,* Mr. Cleveland was charged with making false representations in an application to the State of Louisiana for a license to operate video poker machines. 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221. In holding that the state did not have a property interest in these licenses for purposes of mail fraud, the court emphasized that at issue was simply an example of "licensing schemes long characterized by this court as exercises of state police powers." *Id.* at 21, 121 S.Ct. 365 (citing cases). The government, although conceding that driver's licenses, medical licenses, and fishing and hunting licenses themselves were "purely regulatory" and not property, *id.* at 22, 121 S.Ct. 365, argued that the state's right to "control the issuance, renewal, and revocation of video poker licenses" was a property

---

**13.** Except *Pasquantino.*

**14.** In *Pasquantino* things were the other way round, for nothing remained to be done: the Canadian tax became "legally due" once the liquor entered Canada.

interest frustrated by Cleveland's conduct, *id.* at 23, 121 S.Ct. 365.

The Supreme Court disagreed, holding that "these intangible rights of allocation, exclusion, and control amount to no more and no less than Louisiana's sovereign power to regulate." *Id.* at 23, 121 S.Ct. 365. This is true because "[e]ven when tied to an expected stream of revenue, the State's right of control does not create a property interest ... [because] [s]uch regulations are paradigmatic exercises of the States' traditional police power." *Id.*

In *Mariani*, the court held that "the civil penalty [for accepting trash at a landfill in excess of the daily limits set forth in the landfill's permit] is plainly ancillary to the Commonwealth's regulatory powers, held by the state not as property, but as an enforcement mechanism.... While an assessed penalty may ultimately yield an economic benefit to the Commonwealth, the primary purpose of the penalty is regulatory.... The government has not cited any case that holds that the state's interest in a civil penalty is that of a 'property holder' for purposes of mail fraud prosecutions. It has been held, however, that a power vested in the state as 'an instrument of regulation' is outside the purview of the mail fraud statute. *See United States v. Schwartz*, 924 F.2d 410, 416–17 (2d Cir.1991); *United States v. Evans*, 844 F.2d 36, 42 (2d. Cir.1988). At least prior to the time that a penalty is actually assessed, the state holds the punitive enforcement mechanism of a civil penalty in its arsenal of sovereign powers to enforce state law. Because the Commonwealth does not possess the punitive enforcement mechanism of a civil penalty as a 'property holder,' but holds it instead as a 'regulator,' the government in this case cannot rely upon the $100 per ton minimum civil penalty as an intended 'property' loss."

So it is here; and it is not to overstate to say that the Commonwealth's interest in controlling driver's licenses through suspensions and revocations is even more thoroughly regulatory than the licensing scheme at issue in *Cleveland,* or in *Schwartz,* or in *Mariani.* In this case the government itself recognizes the regulatory nature of the interest at stake when in the Indictment, paragraph 38 it states that the Commonwealth is being deprived of property "in the form of the Commonwealth's ability to regulate safe drivers on its roadways through licensing suspensions and revocations." To the extent that this assertion constitutes the foll expression of the government's position with respect to its putative status as a "property holder," there exists reason to question the probability that such an assertion will ultimately be accepted for purposes of obtaining a criminal conviction of Bruno.

(b) *Other Relevant Circumstances.*

i. *Respondent's Judicial Record.*

Respondent was appointed to serve as a magisterial district judge in 1998 to fill a vacancy in Chester County. He stood for election to this office in 1999 and was elected. He was twice reelected as magisterial district judge and has served in that office continuously until January 31, 2013 when he was suspended from his judicial duties with pay by President Judge James MacElree of Chester County. On February 1, 2013, the Supreme Court of Pennsylvania suspended the Respondent without pay.

Respondent's fifteen-year tenure in his judicial office appears to have been served in an exemplary fashion attested by his serial re-elections. As a matter of fact our record here supports the observation that his service as a judicial officer is touched with some distinctions. For example, he was elected President of the Magisterial

District Judges of Chester County in 2005 and served in that office for two years. He was elected President of the Magisterial District Judges of District 11 (includes Philadelphia, Montgomery, Bucks, Delaware and Chester counties) in July 2006 and served until June 2008. He was elected Vice President of the Special Court Judges Association of Pennsylvania in 2008 and served on the Executive Committee from 2008 to 2012 and as President from June 2010 to June 2011. He also has served on the Constables Relations Committee and Redistricting Committee of the Association.

In September 2006 he was appointed by the Supreme Court to the Rules Committee of the Minor Judiciary of Pennsylvania; he was reappointed in September of 2009 and in April of 2010 he was appointed Chairman by Chief Justice Castille and served as Chairman until August 2012.

### ii. Case Pending in the U.S. District Court.

The criminal case against Respondent, *U.S. v. Bruno*, U.S.D.C.E.D.Pa., No. 13–CR–39, has been certified by the trial judge, Honorable Robert F. Kelly as a "complex case." (N.T. Hearing April 8, 2013, p. 19). Vincent DiFabio, Esquire who is representing the Respondent in that case testified that Judge Kelly has set several dates for production of discovery and a tentative trial date of November 12, 2013. (N.T., p. 10). Mr. DiFabio testified that there are nine defendants in the case and that the United States Attorney has advised him that there are 85 potential witnesses, close to a thousand hours of telephone taps, and hundreds of pages of Grand Jury transcripts. (N.T., p. 11). In view of the volume of discovery and the need to review it, Judge Kelly has instructed counsel to report to him on September 15, 2013 to advise if they need additional time to prepare for trial. (N.T., p. 10). It appears quite possible that the case will not come on for trial until 2014.

### (c) Other Cases.

We think it is important that we look at other cases where interim suspensions have been sought and suspension orders entered both with and without pay.[15] There are at least two reasons why this is important. One is that it is important courts dispense "equal justice under law"—and be seen to—so that those whose conduct resembles others' conduct and whose circumstances resemble others' circumstances receive treatment which resembles the treatment in the other cases. The second reason is that we consider it to be a major part of this Court's job to inform, by its decisions, the judges of the Commonwealth so that they will have some measure of educated expectations as to the action this Court might take in given cases.

---

15. In one case, *In re Smith*, 712 A.2d 849, 852 (Pa.Ct.Jud.Disc.1998), we denied a petition for an interim order for suspension with pay. There we "hastened to state" that:

we do not regard a petition to suspend a judicial officer—even with pay—to be a matter of minor importance. Nor should the fact that some respondents do not resist the imposition of such an order have any bearing on our consideration of the question. This respondent *is* resisting, and we believe that he is correct in asserting that an order of suspension will impart a "taint" upon him and his aspirations to hold judicial office, which he will carry with him for the rest of his life. Certainly, his political enemies, if any he has, or if any he should have in the future, will be able to say to an electorate largely ignorant of the circumstances: "He was taken off the bench by the Court of Judicial Discipline." So, we believe that the decisions of this Court upon a petition for *any* order of suspension—with or without pay—involve matters of importance and deserve serious consideration.

In reviewing the earlier interim suspension cases, one thing stands out: On only two occasions has this Court entered an order of interim suspension without pay.[16] This statistic was emphasized by Respondent in *In re Melvin*, 57 A.3d 226 (Pa.Ct. Jud.Disc.2012) in her argument that her suspension should be with pay. We observed that:

> The point is well taken and we acknowledge it; but what it signifies is that this Court has been reluctant to suspend without pay [prior to a hearing] and has been careful to do so only in the most egregious cases....

*Id.* at 240. And indeed the two cases were egregious. In *In re Jaffe*, 814 A.2d 308 (Pa.Ct.Jud.Disc.2003), the Respondent was charged with extorting large sums of money from two lawyers who represented numerous plaintiffs in cases before him; and in *In re Melvin, supra.* Respondent was charged with crimes which included forcing and coercing her employees (secretaries and law clerks) to commit crimes, to aid her to commit crimes, and to violate an order of the Supreme Court. The conduct with which Judge Bruno is charged does not approximate the conduct of Respondents in the *Jaffe* and *Melvin* cases for in no way is it imbued with the gravity and the overt disdain for the law on display in those cases.

We now set out a list of interim suspension cases, including the nature of the conduct in each, and this Court's dispositions of them:

| CASE | TYPE OF PETITION | DISPOSITION BY CJD | CHARGES |
|---|---|---|---|
| Larsen | Interim Suspension With Pay | Denied (before trial) | Illegal drug purchase |
| Larsen | Interim Suspension Without Pay | Granted (after conviction) | Illegal drug purchase |
| Strock | Interim Suspension With Pay | Granted | Misappropriation of Court funds |
| Smith | Interim Suspension With Pay | Denied | This was a trumped-up case |
| McFalls | Interim Suspension Without Pay | Denied-suspended with pay | Failure to perform judicial duties and public drunkenness |
| Jaffe | Interim Suspension Without Pay | Granted | Extortion |
| Cioppa | Interim Suspension With Pay | Granted | Sexual harassment of litigants |
| Ballentine | Interim Suspension With Pay | Granted | Dismissing her own motor vehicle violations |
| Melvin | Interim Suspension With Pay | Granted | Improper use of judicial employees for personal benefit |
| Melvin | Interim Suspension Without Pay | Granted | Improper use of judicial employees for personal benefit |

To complete the picture we include a list of cases where the Supreme Court entered orders of interim suspension:

16. We are aware that our Supreme Court has been entering orders of interim suspension without pay, *see, e.g., In re Mulgrew*, 388 JAD (order dated 9/19/2012); *In re Singletary*, 377 JAD (order dated 1/5/2012); to *In re Lowry* 397 JAD (order dated 2/1/2013); *In re Sullivan*, 398 JAD (order dated 2/1/2013); and this case, as well as orders of interim suspension with pay, *see, e.g., In re Nocella*, 391 JAD (order dated 11/9/2012); and *In re Merlo*, 361 JAD (order dated 12/22/2010).

| CASE | TYPE OF PLEADING FILED IN CJD | DISPOSITION BY SUPREME COURT | DISPOSITION BY CJD | CHARGES |
|---|---|---|---|---|
| Amati | None filed until after conviction | Suspended with pay 4/23/99 | Suspended without pay 4/24/01 (after conviction) | Obstruction of justice, etc. |
| Joyce | None filed | Suspended with pay 8/21/07 | No disposition | Insurance fraud |
| Merlo | None filed | Suspended with pay 12/22/10 | No disposition | Repeatedly late and absent from work, etc. |
| Singletary | None filed | Suspended without pay 1/5/12 | No disposition | Showing photos of his erect penis |
| Melvin | Petition for Suspension with pay 5/18/12 | Suspended with pay 5/18/12 | Suspended with pay 5/22/12; Order amended to suspend without pay 8/30/12 | Improper use of judicial employees for personal benefit |
| Mulgrew | Petition for Suspension without pay 9/14/12 | Suspended without pay 9/19/12 | Suspended with pay 9/14/12 | Theft of government funds |
| Nocella | None filed | Suspended with pay 11/9/12 | No disposition | Misrepresentation of qualifications, etc. |

We will not here undertake an analysis of each earlier case to determine how the level of scandal caused by the conduct charged in each case compares to that caused by the charges made against this Respondent. It is sufficient that we list them, for review of the list leads easily to the conclusion that there really is "no comparison" in that regard between this case and the *Jaffe* and *Melvin* cases; and also to the realization that there are several cases on the lists where the conduct charged was more contemptuous of the law than anything alleged here and thus more likely to cause a shock to the public's confidence in the judiciary, yet, in those cases, the interim suspensions were ordered to be *with* pay.

There are a number of cases which are not on these lists but which we will consider because the conduct charged in those cases was "fixing cases."

In the early 1990s there was a scandal in the Allegheny County equivalent of the Philadelphia Traffic Court.[17] In three un-

related incidents, three non-Allegheny County district justices were caught by telephone taps having a conversation with Walter "Bo" Cross, supervisor of the Allegheny County court, about "fixing" a case. The Judicial Conduct Board filed a Complaint in this Court in each of those cases: *In re Joyce*, 712 A.2d 834 (Pa.Ct.Jud.Disc. 1998); *In re Terrick*, 712 A.2d 834 (Pa.Ct. Jud.Disc.1998); *In re Trkula*, 699 A.2d 3 (Pa.Ct.Jud.Disc.1997). In none of those cases was an interim suspension of any kind ordered by this Court—or any court. In none of those cases were interim suspensions sought.

Two other "ticket fixing" cases were brought before this Court by the Judicial Conduct Board: *In re Berkhimer*, 828 A.2d 19 (Pa.Ct.Jud.Disc.2003) and *In re Kelly*, 757 A.2d 456 (Pa.Ct.Jud.Disc.2000). In these cases, Respondents were charged with fixing, or attempting to fix, one case. These cases were unrelated to the Allegheny County "scandal" and to each other. In

---

**17.** See case of *United States v. Cross and Melograne*, 128 F.3d 145 (3d Cir.1997) dis-   cussed earlier.

neither case was an interim suspension entered and in neither of these cases was interim suspension sought.

In the Allegheny County situation District Justice Jules Melograne, along with his brother, Nunzio, a tipstaff in the Statutory Appeals Court, and the Court Supervisor, Walter "Bo" Cross, were the main "fixers." As related earlier herein, they were charged with federal crimes and, on August 26, 1993 [18] the Supreme Court suspended Jules Melograne from his judicial office *with* pay.

Jules Melograne was charged with fixing hundreds of cases over an extended period of time which conduct and charges closely resemble the conduct leading to the charges which have been filed against the regular traffic court judges in the Indictment which includes this Respondent. The regular traffic court judges have been charged with fixing hundreds of cases over an extended period of time, but, as we stated earlier, the Indictment, in our view, falls decidedly short of alleging that Bruno was a participant in that grand scheme; but, rather is limited to two incidents (the L.R. tickets and the J.M. ticket) and contain no allegations of wrongdoing by Bruno in connection with either.

In this jurisprudential setting, then, suspending this Respondent *without* pay would be a holding—a declaration—that the public is scandalized to a greater degree by the scant and shaky allegations against Bruno on two isolated occasions [19] than by charges of fixing hundreds of cases over a long period of years made against Melograne, who was suspended *with* pay.[20] We will not make that holding or that declaration, for, by any measure, the totality of the circumstances requires that this Respondent's interim suspension be with pay.

## C. THIS COURT'S AUTHORITY TO ISSUE INTERIM SUSPENSION ORDERS WITH PAY IN LIGHT OF SUPREME COURT'S FEBRUARY 1, 2013 ORDER SUSPENDING WITHOUT PAY.

On February 1, 2013, the day after Bruno's Indictment was announced, the Supreme Court suspended Bruno without pay.[21] We have considered the question of whether the existence of the Supreme Court's February 1, 2013 order constitutes a bar to this Court taking action on the pending Petition for Suspension Without Pay. We conclude that it does not for the following reasons.

First, we note that the abundant factual background discussed in this Court's opinion was made available to this Court at the time of our evidentiary hearing, April 8, 2013. This information was not formally of record before the Supreme Court at any time up to and through the time of the issuance of its February 1, 2013 order suspending Bruno without pay.

Second, we agree with Judge Clement's concurring opinion that the Constitutional Amendments of 1993, specifically Article V, § 18(d)(2), plainly confer authority to

---

18. This was shortly before this Court was in business. The original judges of this Court were sworn in on November 26, 1993.

19. And despite allegations in the Indictment that the illegal activity which had become everyday fare at traffic court was essentially interrupted when Bruno and the other district judges were there once a year.

20. Melograne's suspension with pay lasted from August 26, 1993 until he resigned on January 22, 1996 after conviction.

21. The details of the Supreme Court's action and the status of the matter pending before this Court at that time are recited at pp. 799–800 of Judge Clement's concurring opinion.

issue orders of interim suspension on this Court—the Court of Judicial Discipline. There exists no reason to conclude that that authority does not extend to the circumstances presented here.

Third, as observed by Judge Clement's concurring opinion, this is not the first time this Court has entered an interim order that conflicted with an earlier interim order entered by the Supreme Court. In August 2012, we entered an interim order suspending then Justice Joan One Melvin without pay. In that case the Supreme Court had earlier suspended the justice with pay. The orders in *In re Melvin* were no less in conflict than the orders here, yet in the *Melvin* case the Supreme Court took no further action—in our view, entirely consistent with and in recognition of this Court's right, authority, and duty to enter such an order.

Accordingly, because we have a more full record than that which was available to the Supreme Court at the time of its February 1, 2013 order, because a plain reading of the relevant constitutional language confers the authority to issue interim suspension orders on this Court, and because the Supreme Court has recently recognized that authority in *In re Melvin*—for each of these reasons, relied upon individually and collectively, we find ample authority for this Court's entry of the instant order suspending Bruno with pay.

Judge CLEMENT files a concurring opinion in which Judge CELLUCCI and Judge MULLEN join.

Concurring opinion by Judge CLEMENT

I agree with the decision of this Court that the suspension of Respondent pending disposition of the underlying criminal charges should be with pay, and I also agree fully with the reasons for that opinion which are set forth therein.

I write this concurring opinion because our Order is in conflict with the Order of our Supreme Court entered February 1, 2013 suspending this Respondent without pay, and I think that, in that circumstance, our responsibilities are not fully discharged unless we provide a thorough explanation of our rationale for doing so. I think we owe it to the Supreme Court to do so, as well as to all the judges throughout the Commonwealth and to the people who approved the 1993 amendments to the Pennsylvania Constitution.

As we have mentioned, our Supreme Court, on February 1, 2013, the day after his Indictment was announced, suspended Respondent without pay. At that time we had before us a Petition of the Judicial Conduct Board requesting that this Court, under the authority placed in this Court by Article V, § 18(d)(2) of the Pennsylvania Constitution, enter an interim order of suspension without pay.[1] On February 1, 2013, the members of this Court had scheduled a telephone conference for 2:45 p.m. that day, to consider the Board's Petition; however, around 2:30 p.m. we received word that the Supreme Court had entered its aforementioned order. Having that information, we cancelled the conference and took no action.

Thereafter, on March 21, 2013, Respondent filed an Answer to the Board's Petition setting forth reasons why Respondent's suspension should be with pay and not without pay and requesting an appropriate order be entered. Inasmuch as the Board's Petition was still before us undis-

---

1. Which we here deny under the authority placed in this Court by Article V, § 18(d)(2) of the Pennsylvania Constitution.

posed, and inasmuch as the Constitution has made it our duty to dispose of such petitions, we undertook to dispose of it. We reviewed the Indictment and discovered the true nature of the charges against Judge Bruno and that they were not what they were stated to be in the Board's Petition.[2] We held a hearing on April 8, 2013 when we took testimony and heard argument.[3] Based on that, we entered the Interim Order Suspending Respondent With Pay filed with this opinion.

Since that order is obviously in conflict with the Supreme Court's order which suspends Respondent without pay, the question arose as to whether or not our opinion, in addition to setting out the reasons why we believed suspension with pay was the right thing to do, should include the reasons for our view that the constitutional amendments of 1993 place the authority to enter interim orders of suspension on the Court of Judicial Discipline—and that that authority is exclusive. Initially we thought that would not be necessary first, because we *do* have the authority (that is undeniable) and because this is not the first time this Court has entered an interim order which conflicted with an earlier interim order entered by the Supreme Court. As recently as August 2012, we entered an interim order suspending then Justice Joan Orie Melvin without pay. In that case the Supreme Court had earlier suspended the justice with pay. The orders in *Melvin* were no less in conflict than the

orders here, yet in the *Melvin* case the Supreme Court took no further action, and had nothing to say about the conflict. We took that to signify that the Supreme Court had no problem, first, with the conflict, and second, with our order, and third, with this Court's right, authority and duty to enter it.[4] We considered the possibility that the Supreme Court's reaction might be the same in this case. However, we cannot know that; but we do know that the Supreme Court disagrees with our view that the drafters of the Constitutional Amendments of 1993 intended that the authority explicitly conferred on the Court of Judicial Discipline in Article V, § 18(d)(2) be exclusive. In this jurisprudential setting I believe it is important to set forth the reasons for that view.

The Supreme Court has expressed its disagreement in a few opinions since 1993: *In re Avellino*, 547 Pa. 385, 690 A.2d 1138 (1997); *In re McFalls*, 568 Pa. 228, 795 A.2d 367 (2002); and *In re Merlo*, 609 Pa. 598, 17 A.3d 869 (2011); and in a number of orders (without opinion): *In re Joyce*, 304 JAD (orders dated 8/17/2007, 8/21/2007); *In re Merlo*, 361 JAD (order dated 12/22/2010); *In re Singletary*, 377 JAD (order dated 1/5/2012); *In re Melvin*, 384 JAD (order dated 5/18/2012); *In re Mulgrew*, 388 JAD (order dated 9/19/2012); *In re Nocella*, 391 JAD (order dated 11/9/2012); *In re Lowry*, 397 JAD (order dated 2/1/2013); *In re Sullivan*, 398 JAD (order dated 2/1/2013); and this case, *In re*

---

**2.** Which the Board promptly amended.

**3.** This is not to say that we considered a hearing to be required under Article V, § 18(d)(2) which, as we know, authorizes the entry of interim orders "prior to hearing"; but, rather, given the circumstances of this case, we considered it an advisable thing to do.

**4.** This suggests that the Supreme Court is content with both the Supreme Court and

the Court of Judicial Discipline dealing with the judicial business which is the subject matter addressed in Article V, § 18(d)(2) of the Constitution—and in the same cases. This arrangement, where two courts are filing competing orders and opinions, is a jurisprudential state of affairs to be avoided. For certain, the struggle for consistency is automatically elevated and clarity in the law is sacrificed.

*Bruno,* 399 JAD (order dated 2/1/2013). In all of these orders the Supreme Court cites its opinions in *Avellino* and *McFalls* as supporting its action.[5]

I will discuss these cases, especially *Avellino,* for it is that case which confers legitimacy on all the others. I will also examine Article V, § 10(a) of the Pennsylvania Constitution which the Supreme Court holds out as providing it with the authority to decide the question of whether and what kind of interim orders of suspension ought to be entered in any given case after 1993. The Supreme Court has on occasion cited its "King's Bench Powers" as supporting its entry of interim orders of suspension after 1993,[6] and I will discuss the necessity and propriety of the Court's exercise of King's Bench Power in that context.

In *Avellino,* the Supreme Court based its decision that it retains the "supervisory powers" conferred in Article V, § 10(a), including the authority to impose interim suspensions (even after the 1993 amendments to Article V) on its earlier holding and opinion in *In re Franciscus,* 471 Pa. 53, 369 A.2d 1190 (1977). In the *Avellino* opinion, *supra,* at 396, 690 A.2d at 1143 the Supreme Court stated:

> The 1993 amendments, however, altered the mechanism for investigating and adjudicating charges of judicial misconduct by abolishing the Judicial Inquiry and Review Board and creating the Judicial Conduct Board and the Court of Judicial Discipline. Given our clear holding sixteen years earlier in *Franciscus* that our supervisory power was neither revoked nor diminished by Section 18, had the people intended to revoke or diminish that power in amending Section 18 the

amendment would have explicitly so provided. Nowhere in the amended Section 18 is such an intention expressed or even implied.

I think it was, and continues to be, wrong to equate *Avellino* and *Franciscus* and by doing so to bestow precedential quality on *Franciscus* on the question of who should be imposing interim suspensions after 1993. It is wrong because it is wrong to equate the changes to the Judiciary Article made in the 1968 Constitutional Convention with the changes made to that Article in 1993. The 1968 amendments created the Judicial Inquiry and Review Board (JIRB). JIRB bore no resemblance to the Court of Judicial Discipline. All JIRB was authorized to do by the 1968 amendments was investigate charges which it then filed with itself, take testimony and make recommendations to the Supreme Court. The Supreme Court reviewed all cases *de novo.* JIRB was given no authority to impose discipline of *any kind.* JIRB was given no authority to impose interim suspensions—the 1968 amendments make no mention of interim suspensions. Under the 1968 amendments all disciplinary authority continued to reside in the Supreme Court.

Thus, it was not inappropriate to observe (as the Supreme Court did in *Avellino* ) that *the 1968 amendments creating JIRB* "neither revoked nor diminished [the Supreme Court's] supervisory power" and that "Nowhere in the ... [1968 amendments] is such an intention expressed or even implied." However, it is *entirely inappropriate* to say that about the 1993 amendments (which the Supreme Court

**5.** Except in *Melvin.* where no authority is cited. In *Nocella,* the Court also cited its order in *Singletary* in addition to *Avellino* and *McFalls.*

**6.** *See, e.g., In re Avellino, supra* and *In re Merlo, supra.*

was saying in *Avellino* ),[7] for *Avellino* was decided in 1997, at which time the 1968 amendments creating JIRB had been *replaced* by the 1993 amendments, and the 1993 amendments *do greatly diminish* the Supreme Court's supervisory powers. For example, its scope of review of final orders of this Court is seriously circumscribed,[8] and, most importantly, the 1993 amendments specifically empower the Court of Judicial Discipline to impose interim suspensions. That is all we are talking about here: interim suspensions; and it is entirely reasonable to hold that the inclusion of Section 18(d)(2) in the 1993 amendments, if not an express transfer of the responsibility for the business of interim suspensions to this Court, it certainly is strongly implied. As a matter of fact, it is quite reasonable to regard Section 18(d)(2) as an *express* transfer of responsibility for interim suspensions to this Court because it contains an *express* diminishment in the Supreme Court's supervisory powers by *expressly* providing that the Supreme Court has *no authority* to review orders of this Court imposing interim suspensions. Article V, § 18(d)(2) of the Constitution provides:

> An interim order under this paragraph shall not be considered a final order from which an appeal may be taken.

Surely there could not have been a more specific and emphatic declaration by the drafters that it was their intention that the Court of Judicial Discipline have exclusive responsibility for interim suspensions. Yet, the Supreme Court's use of Section 10(a) of Article V and (sometimes) King's Bench power to justify its entry of interim orders of suspension, nullifies that inten-

tion. That is the direction in which the Supreme Court has been headed since *Avellino* which came to full fruition with the Court's action in the case of *In re Mulgrew*, No. 6 JD 12 (Pa.Ct.Jud.Disc). In that case the Court of Judicial Discipline entered an order suspending that Respondent with pay. Five days later the Supreme Court, *sua sponte*, ordered the Respondent suspended without pay, citing *Avellino* and *McFalls*. (See, 388 JAD (order dated 9/19/2012)).

So long as the Supreme Court holds the position that it continues to have authority to enter interim orders of suspension even after the 1993 constitutional amendments under its "supervisory and administrative authority" bestowed in Section 10(a) of Article V, there is a clear cut conflict between Section 10(a) and Section 18(d)(2) of Article V of the Constitution. It seems obvious that guidance to a resolution of this conflict will be found in the rules of statutory construction.

The first rule of statutory construction is 1 Pa.C.S.A. § 1921, which in pertinent part provides:

> § 1921. Legislative intent controls
>
> a) ... Every statute shall be construed, if possible, to give effect to all its provisions.

I think it is beyond argument that when the people of the Commonwealth established the Court of Judicial Discipline in 1993, specifying enumerated duties for that Court to perform, including the duty to decide whether or not interim orders of suspension should be entered in any cases, and providing that those orders were not

---

7. In *Avellino* the Court based its holding entirely upon its earlier opinion in *In re Franciscus*, 471 Pa. 53, 369 A.2d 1190 (1977), which was decided after the 1968 Constitutional Convention and before the 1993 constitutional amendments.

8. The 1968 amendments provided the Supreme Court's scope of review was *de novo*. The 1993 amendments provide that the Supreme Court's scope of review is on the law, plenary; on the facts, abuse of discretion; on the sanction, whether the sanction is legal.

appealable to any other court, that they intended that those orders were not to be overridden and that the Court of Judicial Discipline should be free from interference in performing its duty so assigned. In the case of *Walsh v. Tate,* 444 Pa. 229, 282 A.2d 284 (1971), the Supreme Court was construing two competing constitutional provisions and said that, in the course of doing so:

> . . . the presumption is that each and every clause in a written constitution has been inserted for some useful purpose and courts should avoid a construction which would render any portion of the constitution meaningless.

*Id.* at 237, 282 A.2d at 288. The clause we here consider is:

> An interim order under this paragraph shall not be considered a final order from which an appeal may be taken.

That the inserting of that clause in Section 18(d)(2) in Article V will have been a useless act and the clause meaningless is vividly demonstrated when the Supreme Court enters interim orders of suspension *sua sponte* which, in some cases, are consonant with interim orders of this Court, and, in other cases, inconsonant, *see, Melvin* and *Mulgrew, supra,* and this case.

One of the most helpful and frequently used rules of statutory construction is the one found at 1 Pa.C.S.A. § 1933 which provides:

> § 1933. Particular controls general

> Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions

shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail.

This is a rule of common sense and easy to understand. Applying it to the conflict here, it is seen at the outset that Article V (the "Judiciary" Article) is drafted in 18 (separate) sections. Section 10 is entitled the section on "Judicial Administration." Section 18 is entitled the section on "Suspension, removal, discipline and other sanctions."

This, by itself, tells one attempting to resolve the conflict, that Section 10 will be covering administrative matters—which does *not* include matters of suspension, removal, discipline and other sanctions because those matters will be covered in Section 18. This conclusion is bolstered by a review of Section 10(a) which will show that there is *no mention* of discipline in the section, nor of suspension—nor of interim suspension; it's all about assignment of judges. This conclusion is likewise supported by a review of Section 18 which shows that that section, in contrast, is devoted *solely* and *entirely* to matters of discipline, and suspension—and interim suspension.

It cannot be denied that, under § 1933, the provisions of Section 18 relating to discipline and suspension—and particularly to interim suspension—are specific and "prevail" over the very general provisions of Section 10(a) which may be said to be in conflict with them.[9]

Lastly, on this subject, any effort to discover the subject matter that the drafters were intending to cover in Section

---

9. In addition, § 1933 provides an exception to the rule in cases, where the "general" provision was enacted later; in this case, however, Section 18 was enacted *after* Section 10.

10(a) must include consideration of the name they gave it. "Judicial Administration" is the title or name they decided to give the section—presumably doing their best to inform the constitutional scholars and other readers of the nature of the subject matter they were covering in the section, i.e., that it was "Administration"—not discipline.[10]

Inasmuch as the Supreme Court has repeatedly cited *Avellino* and *McFalls* as providing support for its entering interim orders of suspension after 1993, it is propitious here to take a close look at those cases to see what kind of cases they were.

*Avellino* was a Philadelphia judge who was disobeying his president judge by refusing to accept an assignment. His president judge sought help from the Supreme Court and filed a Petition requesting that the Supreme Court exercise its administrative power under Article V, Section 10(a) to require compliance with the assignment. Thus, the case came to the Court as an *assignment* case [11]—not a disciplinary case, and the Court exercised its power under Section 10(a) as requested and ordered Avellino to accept the assignment. This is what Section 10(a) was designed to do.

*McFalls* was an Allegheny County judge who was getting drunk in public who was placed on administrative leave by his president judge. The matter came to a head when McFalls repeatedly failed to attend meetings scheduled by his president judge "to discuss the resumption of his judicial duties and the terms and conditions appur-

tenant thereto." Like *Avellino*, *McFalls* was an *assignment* case, not a disciplinary case, coming to the Supreme Court, as it did, upon the Petition of the president judge requesting that Court to exercise its supervisory and administrative authority under Article V, Section 10(a) to order McFalls to meet with his president judge—which the Court did. The Court explained the derivation of its power to do so as follows:

> Here, Respondent failed to comply with the Petitioners' repeated attempts to conduct a meeting at which the terms and conditions regarding Respondent's judicial assignment were to be discussed. Clearly, *this administrative matter* is within the supervisory power of this Court. (Emphasis added.)

*In Re: Assignment of Judge Patrick H. McFalls, Jr., supra,* at 238, 795 A.2d at 373. Inasmuch as the Court was depending heavily on *Avellino* as precedent for its action in *McFalls,* the Court took the time to defend its exercise of authority in the earlier case. The Court said:

> In rejecting Avellino's assertion that this Court lacked jurisdiction to entertain the petition, we noted that *because the matter involved an assignment* given to Avellino by the administrative judge of the court, and because the authority under which assignments are made ultimately derives from this Court, "review and resolution of any disputes *concerning assignments* must necessarily be subject to the authority of this Court." *Avellino,* 690 A.2d at 1141. In this regard, we further stated the following:

---

**10.** See 1 Pa.C.S.A. § 1924 which provides in pertinent part:

> § 1924. Construction of titles, preambles, provisos, exceptions and headings .... the headings prefixed to titles, parts, articles, chapters, sections and other divisions of a statute ... may be used to aid in the construction thereof.

**11.** To discover that *Avellino*—and *McFalls* as well—were assignment cases one need look no further than their captions: *"In Re: Assignment of Judge Bernard J. Avellino"* and *"In Re: Assignment of Judge Patrick H. McFalls, Jr."*

... we have also established that the assignment of Judge Avellino to the felony-waiver program was made under the administrative authority of this Court delegated to Judge Herron as Administrative Judge, *and therefore review of that assignment for any reason is properly within the supervisory power of this Court. Id.,* 690 A.2d at 1143. (Emphasis added.)

*Id.* In both *Avellino* and *McFalls* the Court took care of the assignment business and then suspended Avellino for 90 days and McFalls for 30 days, both without pay. It is important to note that these were not "interim suspensions" such as the order the Supreme Court entered in *Franciscus,* or such that are dealt with in Section 18(d)(2) of the 1993 amendments to Article V. Neither of the suspensions in *Avellino* or *McFalls* were entered to head off the public disesteem for the judicial system likely to develop when a judge charged with crimes continues to "hold court"—as in *Franciscus.* There was no necessity or urgency to get Avellino or McFalls *off* the bench—they weren't *on* the bench. They were *refusing* to get on the bench.

Viewed thus, then, it is clear that *Avellino* and *McFalls* do not have the precedential credentials ascribed to them by the Supreme Court as providing support for that Court's entry of interim suspensions in the post–1993 cases listed herein.

The Supreme Court has stated that its King's Bench power (in addition to Article V, Section 10(a)) confers upon it the authority to enter interim orders of suspension, even after 1993 and has cited its opinion in *Carpentertown Coal & Coke Co. v. Laird,* 360 Pa. 94, 61 A.2d 426 (1948) in support of that proposition, see *Avellino, supra,* at 390–91, 690 A.2d at 1140–41.[12] It is respectfully reported, however, that

one reviewing the opinion in *Carpentertown* will not find that support.

In that case our Supreme Court reviewed the origin and nature of its King's Bench power:

Inherent in the Court of King's Bench was the power of general superintendency over inferior *tribunals,* a power which was of ancient inception and recognized by the common law from its very beginnings. Blackstone says, Book III, "The jurisdiction of this court [of King's Bench] is very high and transcendent. It *keeps all inferior jurisdictions within the bounds of their authority* and may either remove their proceedings to be determined here, or prohibit their progress below." By the Act of 1722 the Supreme Court of Pennsylvania was placed in the same relation to all inferior jurisdictions that the King's Bench in England occupied, *and thus the power of superintendency over inferior tribunals became vested in this court from the time of its creation. Commonwealth v. Ickhoff,* 33 Pa. 80, 81; *Chase v. Miller,* 41 Pa. 403, 411. In the exercise of its supervisory powers over subordinate *tribunals* the Court of King's Bench employed the writ of prohibition and such right and practice accordingly passed to the Supreme Court. [Citations omitted,] (Emphasis added.)

*Id.* at 99–100, 61 A.2d at 428–29. And again on the purpose of the power:

Its principal purpose is *to prevent an inferior judicial tribunal* from assuming a jurisdiction with which is not legally vested in cases where damage and injustice would otherwise be likely to follow from such action. It does not seek relief from any alleged wrong threatened by an adverse party; indeed it is not a proceeding between private litigants at

---

12.  *See, also, In re Merlo,* 609 Pa. 598, 17 A.3d 869, 871 referring to *Avellino.*

all *but solely between two courts, a superior and an inferior, being the means by which the former exercises superintendence over the latter and keeps it within the limits of its rightful powers and jurisdiction.* (Emphasis added.)

*Id.* at 98, 61 A.2d at 428. Thus, the salient teaching of *Carpentertown* is its unambiguous announcement that the power of superintendence inherent in the Court's King's Bench power is the superintendence of lower courts, of lower tribunals not of the behavior of lower court judges. [13]

It happens that this precise issue was the subject of a study which was made in preparation for the Constitutional Convention of 1967-68. The study was conducted under the directorship of Burton R. Laub, then Dean of the Dickinson School of Law, and was published in *Reference Manual No. 5, The Judiciary. Reference Manual No. 5* contains the findings and conclusions of the study as to the state of the law at that time on the various subjects relating to the judiciary and was for the education of the delegates upon entering their deliberations.

In Chapter V of the *Manual,* which is entitled, 'Removal, Suspension and Discipline of Judges,' at § 2 is set out the 'Present Constitutional Provisions.' That section states:

The Pennsylvania Constitution specifically provides three different methods of removing judges from office: (1) impeachment, (2) address, and (3) conviction of misbehavior in office or of any infamous crime ... There is no express provision for suspension or discipline of judges short of removal. Nevertheless, a fourth method might be available to remove, suspend or discipline judges; namely, the exercise by the Supreme Court of its inherent common law supervisory powers over the entire judicial system. The word 'might' is used advisedly because apparently the Supreme Court has never squarely decided whether its inherent supervisory powers extend to the removal, suspension or discipline of judges.[14]

*Reference Manual No. 5, The Judiciary,* at 158.

The study, after reviewing the three constitutional methods of removal,[15] then urns to the "fourth" method it referred to earlier and reports as follows:

§ 3. Inherent Power of Supreme Court to Remove or Discipline Judges

An untried and untested method for removing and disciplining judges *may* be available in Pennsylvania; namely, the inherent power of the Supreme Court to supervise the judicial system. The Supreme Court has affirmed the existence of its general supervisory power over inferior courts on a number of occasions, but has never, so far as the research staff has been able to discover, applied this power to remove or discipline lower court judges. At least one attempt was made to invoke the Court's King's Bench powers to remove a judge, but no action was taken because the judge in question

---

**13.** This would be congruent with (and help explain why) the superintendence of the latter is conferred separately, in a different section of the Constitution, i.e., in Section 18; and, in 1993, in that section, made the responsibility of the Judicial Conduct Board and the Court of Judicial Discipline.

**14.** This 'never' would include *Carpentertown,* which was decided in 1948, and is in accord with the conclusion that that case is not authority for the proposition that the Supreme Court's King's Bench powers extend to the discipline of lower court judges.

**15.** None of which deal with suspension or interim suspension.

voluntarily agreed to stay off the bench until the end of his term.

*Nature, derivation, and extent of Supreme Court's inherent supervisory powers.*

One of the best and most comprehensive statements of the nature and derivation of the Supreme Court's supervisory powers can be found in the case of *Carpentertown Coal & Coke Co. v. Laird.* [Citation omitted.]

*Id.* at 167.

[The study then quotes a portion of the *Carpentertown* opinion, much the same as the portion quoted above, and then goes on to say]:

If the Supreme Court means what it says, then the next question is whether the Court of King's Bench possessed, as part of its general supervisory powers over inferior courts, the power to remove or discipline lower court judges. There appears to be general agreement among legal writers that King's Bench possessed and exercised the power to remove judges and still has such power over inferior judgeships.[16]

*Possible objections based on Pennsylvania court decisions.*

The major difficulties standing in the way of an assertion by the Supreme Court of the power to remove, suspend and discipline judges are the Court's historical inaction in this area and the Court's own holdings that the express constitutional procedures for removing judges, i.e., impeachment, address, and conviction of a crime, are exclusive.

*Id.* 1168–69.

So that was the state of the King's Bench in Pennsylvania as the delegates opened the convention in 1967. And they produced JIRB. Then, in 1976, Charles Franciscus, a justice of the peace in Allegheny County, was indicted in the United States District Court for the Western District of Pennsylvania for crimes "relating to his official duties as a justice of the peace."[17] While his criminal case made its way in federal court, Franciscus continued to hear cases in his court as if nothing had happened. But something had happened: the judge had been charged with crimes and formally indicted; and it does not "look good" for a judge so charged to be "judging others," at least until he should be exonerated. For a fact the public is apt to be scandalized, and any confidence it may have had in the integrity of the judicial system is jeopardized so long as that state of affairs continues. Something needed to be done; and it needed to be done quickly.[18] Recognizing this, the Supreme Court suspended Franciscus without delay. The Court explained why it was necessary as follows:

. . . we have merely exercised our supervisory authority to protect and promote the public confidence in our judicial system, *pending resolution of the proceedings before the Judicial Inquiry and Review Board.* As the highest court of this Commonwealth, we would be remiss

---

**16.** The text contains no citation, and the writers nor their writings are identified.

**17.** *In re Franciscus, supra* at 55, 369 A.2d at 1191.

**18.** At the time JIRB had this case and Franciscus was arguing that the Court should let JIRB handle it; indeed, arguing that the 1968 amendments *required* that JIRB handle it. As we know, the Court rejected that argument because the 1968 amendments required no such thing. Of course, as we also know, JIRB was totally unequipped to deal with the situation for it was without authority to enter orders of suspension of any kind.

in our duty if we neglected to exercise our inherent supervisory power on the theory that another means to resolve the problem may be available, *when the alternative solution would not adequately meet the exigencies of the circumstances presented.* (Emphasis added.)

*In re Franciscus,* 471 Pa. 53, 369 A.2d 1190 (1977). The "alternative solution" to which the Court refers was Franciscus's "solution" that the matter be left with JIRB to be processed as prescribed in the 1968 amendments. The Court promptly rejected this "solution" holding it "would not adequately meet the exigencies of the circumstances presented" which was certainly true given the necessity for entering an order quickly.

*This inadequacy no longer exists.* In 1993, when Section 18 of the Judiciary Article of the Constitution was rewritten to establish a "two tier" system for judicial discipline in Pennsylvania, replacing JIRB with the Judicial Conduct Board and the Court of Judicial Discipline, the Court of Judicial Discipline was given specific authority to enter interim orders of suspension (with or without pay), and it was also given authority to enter them *"prior to a hearing."* [19] So, the delay [20] which would inevitably have occurred in 1976, causing the necessity which impelled the Supreme Court to act in *Franciscus,* has been a non-issue since 1993. It was not necessary for the Supreme Court to enter interim orders of suspension in *Joyce,* nor in *Singletary, Melvin, Mulgrew, Nocella, Lowry, Sullivan* nor in this case,[21] and it was not

necessary in *Merlo* (the only one of the above orders accompanied by an opinion) where the Court justified its entry of the order because it was:

... imperative to safeguard the integrity of the judicial system while the prosecution of judicial misconduct charges advances. The public interest in minimizing the disruption necessarily occasioned by the pendency of judicial misconduct charges on the operation of the judicial system is significant, and requires immediate action.

*In re Merlo,* 17 A.3d at 872–73. The fact is that it was not necessary for the Supreme Court to act because this Court can act as quickly as the Supreme Court can.

In the final analysis, then, the controlling proposition is that it does not matter where one comes down on the question of whether the Supreme Court has the authority (under Article V, Section 10(a) or under its King's Bench power) to enter these interim orders of suspension, for even if one decides that it does (as the Supreme Court has decided) that is only a decision that it *can*—and not a decision that it *should.* The latter decision turns on whether it is *necessary*—at least that is what the Supreme Court has held in the two "interim suspension" cases where we have opinions (*Franciscus* and *Merlo*). I believe that the 1993 amendments to the Pennsylvania Constitution make it clear that it is no longer necessary for the Supreme Court to enter interim orders of suspension (as it was necessary in *Fran-*

---

19. Pa. Const. Art. V, § 18(d)(2).

20. In getting the charged judge off the bench.

21. Neither *Avellino* nor *McFalls* are included in this list, because those cases were assignment cases (as pointed out earlier), not "interim" suspension cases, for no interim suspension orders were entered in either of those cases, i.e., the orders were not entered to protect the judicial system from scandal so long as some charges were pending against either of those judges, both suspensions were without pay and for specified durations—they were "punishment" orders.

*ciscus* ) and that, therefore, it should not.[22]

Judge CELLUCCI and Judge MULLEN join in this concurring opinion.

**22.** See, also, "The Court of Judicial Discipline: A Review of the First Twenty Years," John S. Summers and Rebecca S. Melley, *Pennsylvania Bar Association Quarterly*, January 2013, where the authors identify another reason why the Supreme Court should not be entering interim orders of suspension:

> Second, as previously noted, we are concerned about the risks presented by the seemingly overlapping jurisdiction of the Court and the Pennsylvania Supreme Court in judicial ethics matters. Enforcement of judicial ethics matters in the Commonwealth relies upon the Board's review of complaints and, where appropriate, the Board's filing of formal complaints with the Court, The Board and Court each have developed, and should continue to develop, expertise and experience in their respective spheres. Moreover, the Supreme Court has the last word on judicial ethics matters because decisions of the Court are subject to review by the Supreme Court. This structure is appropriate because the Supreme Court is Pennsylvania's highest court and as such reviews the decisions of all trial courts and intermediate appellate courts. Given this structure, it is difficult to understand why the Supreme Court should ever involve itself in judicial ethics matters prior to an appeal from the Court. To do so undermines the delegation of judicial ethics matters to the Court and puts the Supreme Court in the position of having appeared to pre-judge a matter that would otherwise be before it in the ordinary course.

*Id.* at 24.

Of course, I believe there are other reasons why the Supreme Court should not be entering interim suspension orders after 1993 (which are set forth in this opinion), the most prominent of which is the clear intention of the drafters to make exclusive the unreviewable authority to enter those orders conferred on the Court of Judicial Discipline in 1993.